UNITED STATES of America, Appellee,

v.

Iona M. MOORE, Defendant, Appellant.

No. 90–1324.

United States Court of Appeals,
First Circuit.

Heard Nov. 6, 1990.

Decided Jan. 15, 1991.

James B. Krasnoo, by appointment of the Court, with whom Norris, Kozodoy, Krasnoo & Fong, Boston, Mass., was on brief, for defendant, appellant.

Carolyn Stafford Stein, Asst. U.S. Atty., with whom Wayne A. Budd, U.S. Atty., Boston, Mass., was on brief, for appellee.

Before BREYER, Chief Judge, BROWN,* Senior Circuit Judge, and SELYA, Circuit Judge.

BREYER, Chief Judge.

A jury convicted the appellant, Iona Moore, (1) of conspiring with Priscilla Russell and Adrienne Bristol fraudulently to obtain money from the First Trade Union Savings Bank of Boston, and (2) of fraudulently obtaining $5000 from the bank on each of four separate occasions. *See* 18 U.S.C. § 657 (unlawful to embezzle, abstract, purloin or willfully misapply federally insured bank's money); 18 U.S.C. § 371 (conspiracy). The evidence showed that Moore (a bank teller), Russell (a bank credit-checking official), and Bristol (a bank loan-payment collector) hatched a fraudulent loan scheme that typically worked roughly as follows:

1. Russell would write up a loan application in the name of a non-existent person, usually for $5000. She would invent a social security number, a home address, and a workplace. She would pretend to her supervisor that she had checked sufficiently to warrant granting the loan.

2. The bank would approve the loan and prepare a $5000 check made out to the applicant.

3. Russell, or more often someone else pretending to be the nonexistent borrower, would pick up the check, and go to a teller (usually Moore). The person would have nothing identifying him or her as the nonexistent person. Moore would not insist upon, or check, identi-

* Of the Fifth Circuit, sitting by designation.

fication. She would simply cash the check.

4. The three conspirators would divide the money. Sometimes they would make a few monthly loan payments often by presenting a money order to Moore at her teller's station. Then they would stop repayment.

5. Bristol, the loan-payment collector, would tell the bank it simply had made a bad loan, and the bank would write-off the loan as a bad debt.

Eventually, Bristol quit her job at the bank. A new loan-payment collector, trying to collect some of the old, bad loans, discovered that some of the borrowers did not exist. The FBI investigated.

The Government brought charges against all three conspirators. Russell and Bristol pleaded guilty and, in return for reduced sentence recommendations, they testified against Moore at her trial. Aside from the testimony of these two key witnesses, the Government's evidence against Moore basically consisted of fourteen sets of documents (loan application, promissory note, cashed check, and loan-repayment record), one for each of the fourteen bad loans that Russell said she had helped to engineer. Moore now appeals her conviction, making eleven different arguments designed to show significant legal error at her trial. We have read the trial transcript, and we can find no legal merit in any of her arguments. We shall discuss the most serious argument—related to psychiatric history—first. We shall then discuss the remaining ten, considerably weaker, arguments more briefly.

■ 1. *Psychiatric History.* Appellant's strongest argument concerns the psychological history of co-conspirator Russell. When testifying, on direct examination, in response to a question about having previously had trouble with the law, Russell said: "Yes. Once.... In 1980.... I got into a confrontation with my therapist." She added that she saw the therapist because "I lost my son in a fire and I was having emotional problems." Apparently, Moore's counsel had earlier learned this same information from Russell's

"change of plea" transcript, which counsel received five days before trial. Counsel spoke to the court, the day before trial, about looking into the matter further; he also (unsuccessfully) sought to cross-examine Russell about it at trial. He now says that the court should have permitted further inquiry. We can find no rule of law, however, that required the court to do so.

We have examined four plausible legal theories that Moore might mean to advance. First, she might mean to argue that a pretrial order issued by the magistrate required the Government to give her counsel information about Russell's 1980 consultation. That order says that the Government must provide the defense with "psychiatric records" of a witness (1) to the extent that the Government "is in possession of such records" and (2) if the psychiatric condition was so severe as to affect the witness's "ability to recall said events and to relate them during testimony." The Government did not violate the order, however, because the record does not suggest that either precondition was satisfied. The first precondition was not satisfied, because, in appellant's counsel's words, "Ms. Stein [Government counsel] does not have the records." Indeed, nothing before us suggests the Government had any written information that it failed to give to counsel. The second precondition was not satisfied because, in our view, a ten year old consultation with a therapist, related to a witness's emotional reaction to the death of a child, does not, without more, suggest a present inability to testify accurately. *See United States v. Gonzalez–Sanchez*, 825 F.2d 572, 585–86 (1st Cir.), *cert. denied*, 484 U.S. 989, 108 S.Ct. 510, 98 L.Ed.2d 508 (1987) (witness's mental history relevant to credibility only if it bears on witness's ability to perceive events about which she is testifying).

Second, appellant may mean to point to *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). That case requires the government to provide a defendant with significantly "exculpatory" information in its possession before trial. The record does not suggest that the

Government violated any *Brady* obligation here, however, for it does not suggest that the Government possessed any information other than the information we have just mentioned; and, for the reason we have just mentioned, that information alone was not significantly "exculpatory."

Third, appellant says that the district court should have permitted counsel to cross-examine Russell about her therapist consultation after the matter arose at trial. Evidence about a prior condition of mental instability would be relevant here, however, only if it were to provide some significant help to the jury in its efforts to evaluate the witness's ability to perceive or to recall events or to testify accurately. *See Gonzalez–Sanchez, supra; United States v. Diecidue,* 603 F.2d 535, 551 (5th Cir. 1979), *cert. denied,* 445 U.S. 946, 100 S.Ct. 1345, 63 L.Ed.2d 781 (1980). If relevant, the district court nonetheless has broad discretionary authority to prohibit cross-examination where that cross-examination would introduce into the case collateral matters that could confuse the jury, that would require later introduction of otherwise unnecessary, additional, potentially clarifying evidence, or that might prejudice one of the parties. *See United States v. Lopez,* 611 F.2d 44, 46 (4th Cir.1979) (cross-examination into psychiatric history proper if probatively related to subject of testimony and if it does not introduce confusing collateral issues). The balancing of these considerations is primarily a job for the district court, not for this court. Given the questionable relevance of consultation with a therapist, ten years earlier, related to a child's death, by a witness whose key testimony is fully corroborated by other witnesses and documentary evidence, we can find no abuse here of the court's broad discretionary powers. *See Gonzalez–Sanchez,* 825 F.2d at 586; *Diecidue,* 603 F.2d at 551 (no abuse of discretion excluding evidence of mental illness twelve years before crime); *Cf. United States v. Lindstrom,* 698 F.2d 1154, 1163 (11th Cir.1983) (abuse of discretion to restrict cross-examination into mental history where severe mental disorder and violent behavior were of "specific relevance to the facts at issue"); *Greene v. Wainwright,* 634 F.2d 272, 276 (5th Cir.1981) (abuse of discretion to prohibit cross-examination into recent mental illness "within the same general time period" as the crime).

Fourth, appellant also seems to suggest the district court erred in refusing her request, made the day before trial, for "mental records that related" to Russell. The problem with this argument is that counsel did not make clear to the court just what he wanted the court to order. Initially he seemed to want the court to order the Government to turn over records that it had, but he then conceded that he did not think the Government had any. He then spoke as if he wanted the court to let him cross-examine Russell about the consultation when she took the stand. The court could lawfully deny this request for the reasons just stated. Counsel did not specifically ask the court to take any other action. Nor did he explain why, if he thought the consultation with a therapist a matter of great importance, he had not simply asked Russell about it during the preceding four days.

In sum, we can find no legal error related to Russell's previous psychiatric history. Appellant's remaining ten arguments are as unpersuasive as they are numerous. We shall discuss them only briefly.

2. *Lunch Break.* Appellant argues that the district court should not have allowed the jurors to take a lunch break after the Government's closing argument. She says that break gave the jurors too much time to think about the Government's view of the case before her own counsel could present her own closing arguments. At a minimum, she says, the judge should have instructed the jury, not only "not to discuss the case during the lunchtime break," but also "not to think about" it. Her counsel concedes that he can find no case law supporting this argument. We are not surprised, for, in our view, the district court's decisions fall well within the scope of its discretionary trial-management authority. *See, e.g., United States v. Goode,* 814 F.2d 1353, 1354 (9th Cir.1987) ("review a district court's decisions on trial

management for abuse of discretion"); *United States v. Hershenow,* 680 F.2d 847, 858 (1st Cir.1982) (timing of defendant's opening statement within discretion of trial court); *Hudson v. Blackburn,* 601 F.2d 785, 790 (5th Cir.1979), *cert. denied,* 444 U.S. 1086, 100 S.Ct. 1046, 62 L.Ed.2d 772 (1980) (no abuse of discretion in timing of recesses).

■ 3. *Jury Instruction on Aiding and Abetting.* Appellant says that the district court should have given her proposed jury instruction about "aiding and abetting." The court's charge, however, adequately instructed the jury. *See United States v. Gibson,* 726 F.2d 869, 874 (1st Cir.), *cert. denied,* 466 U.S. 960, 104 S.Ct. 2174, 80 L.Ed.2d 557 (1984) (court's "substantively correct" charge need not "follow the exact form and wording of the defendant's proposed instructions"). The court told the jury that, to convict, they had to find the appellant "knowingly" helped others commit the crimes in question, that the appellant must have "intended" that those crimes be committed, and that appellant "acted with the knowledge and intent of helping others violate the law." Appellant says that her instruction, unlike the court's, would have required the jury to consider whether Moore had the requisite intent "as to all loans." If she means by "all loans," all fourteen bad loans to which Russell confessed, she is right in saying that the court did not tell the jury it had to find a wrongful intent in respect to all fourteen. But the court did not have to do so. The indictment did not charge Moore with helping make fourteen fraudulent loans; it charged her participation in *four* such loans, along with her participation in a general "fraudulent loan" conspiracy. The charge was adequate.

■ 4. *Computer Records.* The government introduced into evidence fourteen computer-generated "loan histories," one for each bad loan. Each loan history consisted of a piece of paper with the borrower's name, the amount of the loan, and the date of each loan payment made, along with a notation showing whether it was made in person to a teller (and which teller) or was made by mail. The "history," in other words, is simply a piece of paper printed out by a computer that stores the relevant information. Appellant correctly points out that these histories are hearsay. She then claims that the district court could not admit them under the "business records" exception because, in her view, the Government failed to lay an adequate "foundation." In her view, the Government failed to show that this "compilation" of "data" about "events" was

> made at or near the time by, or from information transmitted by, a person with knowledge, ... kept in the course of a regularly conducted business activity, and [made as part of] ... the regular practice of that business activity ..., as shown by the testimony of the custodian or other qualified witness....

Fed.R.Evid. 803(6).

The problem for appellant is that the Government did lay an adequate foundation for the records. Its witness, Louise Slattery, testified that she was the head of the bank's consumer loan department, that the records in question were made in the "regular course" of the bank's business, that they were compiled by a "service bureau" connected by phone lines to the bank, and that she and others at the bank could retrieve, and did retrieve, that information from time to time by requesting the information from the bureau. This testimony is more than sufficient to permit the court to find that Louise Slattery was a "qualified witness" (the head of consumer loans is likely to know how loan data are compiled and kept), that the information was kept in the "regular course of business" (she said as much), that they were made on the basis of information transmitted by a person with knowledge (a "service bureau" connected by phone lines to the bank's receiving officials), and that it was the "regular practice" of the bank and bureau to keep such records (she said as much). *See United States v. Catabran,* 836 F.2d 453, 457 (9th Cir.1988) (computer records properly admitted as business records if "(1) made or based on information transmitted by a person with knowledge at or near the time

of the transaction; (2) made in the ordinary course of business; and (3) trustworthy...."); *United States v. Hayes*, 861 F.2d 1225, 1228 (10th Cir.1988) (proper foundation laid for IRS computer records under Fed.R.Evid. 803(6) where IRS employees testified that "tax records were kept in the ordinary course of business and that it was the regular practice of the IRS to keep such records"). We add that it is not required that the qualified witness be a computer programmer, *see United States v. Linn*, 880 F.2d 209, 216 (9th Cir.1989), or that she "be the person who actually prepared the record." *See Wallace Motor Sales, Inc. v. American Motor Sales Corp.*, 780 F.2d 1049, 1060–61 (1st Cir. 1985); *accord United States v. Hutson*, 821 F.2d 1015, 1020 (5th Cir.1987).

■ Appellant goes on to argue that Fed.R.Evid. 803(6) prohibits the introduction of business records that meet the requirement just mentioned if ("unless")

the source of information or the method or circumstances of preparation indicate lack of trustworthiness.

And, she says that the Government's foundation did not show such "trustworthiness." *See, e.g., United States v. Glasser*, 773 F.2d 1553, 1559 (11th Cir.1985) (computer records must be kept pursuant to some routine procedure designed to assure their accuracy). The short and conclusive answer to this argument, however, is that the ordinary business circumstances described suggest trustworthiness, *see Hayes*, 861 F.2d at 1228–29, at least where absolutely nothing in the record in any way implies the lack thereof. If counsel had some special reason for thinking the information untrustworthy, he failed to call it to the court's attention. Indeed, he did not even mention "trustworthiness," or its lack, to the court. *See United States v. Briscoe*, 896 F.2d 1476, 1494–95 (7th Cir.), *cert. denied,* — U.S.——, 111 S.Ct. 173, 112 L.Ed.2d 137 (1990) (proper foundation established where "government provides sufficient facts to warrant a finding that the [computer] records are trustworthy and the opposing party is afforded an opportunity to inquire into the accuracy thereof

and how the records were maintained and produced"); *Linn*, 880 F.2d at 216. Rather, the appellant objected simply by uttering the word "foundation;" this is not a sufficient objection in these circumstances. *See* Fed.R.Evid. 103(a)(1) (requiring that grounds of objection be specifically stated). Finally, we note that it is not required that computers be tested for programming errors before computer records can be admitted under Fed.R.Evid. 803(6). *See Briscoe*, 896 F.2d at 1494. In sum, we can find no abuse of discretion in the district court's admission of the computer records. *See United States v. Hernandez*, 913 F.2d 1506, 1512–13 (10th Cir.1990) (abuse of discretion review for admission of computer records).

■ 5. *Bad Loans Evidence.* Appellant says that the court should not have admitted evidence of all fourteen bad loan transactions. She concedes that documentary evidence shows that she cashed ten of the checks at issue, but she says that the same kind of evidence shows that a different teller handled the remaining four. Appellant failed to make any timely objection to the introduction of this evidence, however. To the contrary, counsel expressly said that he agreed to the admission of the loan application, check, and promissory note related to each of the fourteen transactions, and only made a general motion to strike evidence at the end of the Government's case. Not having made a "timely objection or motion to strike," appellant can complain of the court's decision to admit the evidence only if it constitutes "plain error." *See* Fed.R.Evid. 103; *United States v. Gomez–Pabon*, 911 F.2d 847, 858 (1st Cir.1990) (plain error standard of review applies where no timely objection made); *United States v. Rivera–Santiago*, 872 F.2d 1073, 1085 (1st Cir.), *cert. denied,* — U.S. ——, 109 S.Ct. 3227, 106 L.Ed.2d 576 (1989) (motion to strike at end of Government's case not a "timely objection") (emphasis in original); *United States v. Parodi*, 703 F.2d 768, 783 (4th Cir.1983) ("[t]imeliness of objection under the Rule [103(a)] requires that it 'be made at the time the evidence is offered....'") (cite omitted). Since the evidence in question

concerned the fourteen transactions that co-conspirator Russell admitted she unlawfully carried out pursuant to her general agreement with Slattery and Moore, we can find no error, let alone "plain error." *See Lutwak v. United States,* 344 U.S. 604, 618, 73 S.Ct. 481, 489, 97 L.Ed. 593 (1953) (acts of co-conspirator "relevant to prove the conspiracy"); *United States v. Crocker,* 788 F.2d 802, 806–07 (1st Cir.1986) (evidence of co-conspirator acts admissible to "shed light on the conspirators' roles, method of operation and the extent of the criminal enterprise").

6. *Prejudicial Evidence.* Co-conspirator Bristol testified, in respect to one of the transactions (involving a "borrower" called Barbara Selmon) that she would have presented the $5000 check to Moore, but Moore was absent from the bank that day. Moore seems to say this testimony was prejudicial and not relevant. The testimony seems to us obviously relevant, for it tends to show Moore's participation in the overall scheme, and it helps show the conspirators' method of operation. Whether some sort of potential prejudice outweighed its usefulness in this respect is a matter for the district court, not this court. *See Crocker,* 788 F.2d at 807.

■ 7. *Hearsay.* Co-conspirators Bristol and Russell testified that, when FBI agents confronted them, initially they denied any involvement in the scheme. Appellant claims that this testimony is inadmissible hearsay. The only way that we imagine this testimony hurting Moore is if the jury took it (somewhat perversely) as showing, *contrary to what Bristol and Russell told the FBI,* that Bristol and Russell by denying guilt, were acting like guilty individuals; hence their denial suggests that all were guilty and Russell and Bristol were not just fabricating a story to implicate Moore. Taken in this way, the statements to the FBI are not hearsay; they are, at worst, "verbal conduct which is assertive but offered as a basis for inferring something other than the matter asserted," conduct which is "excluded from the definition of hearsay by the language" in Fed.R.Evid. 801(c), which requires that

the statement be offered to prove the "truth *of the matter asserted.*" *See generally,* 4 Weinstein & Berger, Weinstein's Evidence ¶ 801(c)[01]. Of course, if offered to prove that Russell and Bristol were innocent (which they were not), the statements did not hurt Moore. (We add parenthetically that even if one considered these statements as "assertions of guilt"—the opposite of what they said—they would be admissible as "prior consistent statements" offered to rebut Moore's charge of "recent fabrication." *See* Fed.R.Evid. 801(d)(1)).

8. *Conspiracy Instructions.* Appellant complains about the conspiracy instructions. First, she objects to two "boilerplate" instructions, one explaining why conspiracy is viewed as a separate crime (it "poses a greater threat to the public safety and welfare than individual conduct") and the other pointing out that conspiracy is usually "secret in its origin and in its execution," on the grounds that these instructions had nothing to do with this case. These general instructions seem, at least arguably, appropriate in this case. We can find no rule of law that prohibits the judge from giving them.

■ Appellant also says the judge should have instructed the jury that, to convict her of conspiracy, it had to find (1) that she "cashed [checks] ... with the knowledge that said checks were loans that the bank" would not normally make, and (2) that "she knew ... before or at the time she caused the said checks to be cashed" that "the loans contained false information to induce the bank to give [the] checks to the borrowers...." The court did not have to give these instructions because, as read literally, they suggest that the jury had to believe Moore cashed checks to find her guilty of conspiracy. In fact, the Government's conspiracy charge was not limited to Moore's cashing checks at her window; she also, in the Government's view, helped the other conspirators to complete false loan applications or found friends to masquerade as the fictitious borrowers. The court need not give an instruction that is not "substantively" correct. *See Gibson,* 726 F.2d at 874.

■ 9. *Internal Controls Instruction.* Appellant says that the court should not have instructed the jury that it is not a defense to claim that the bank might have prevented its losses had it had better "internal controls or procedures." We can find nothing wrong with this instruction. It is accurate. And, appellant's counsel's cross-examination of some of the witnesses suggests it was highly suitable. *Cf. United States v. Brien,* 617 F.2d 299, 311 (1st Cir.), *cert. denied,* 446 U.S. 919, 100 S.Ct. 1854, 64 L.Ed.2d 273 (1980) (analogous instruction given in mail fraud case).

■ 10. *Guidelines.* Appellant says that the court, when sentencing her, did not correctly determine the amount of the theft. The court found a "loss" of $44,000. Appellant says that the evidence did not permit the court to find that she was involved in the theft of so large an amount.

The question is whether or not the court should have increased the base "sentencing level" of four levels by six levels to reflect the amount of the "loss" caused by the conspiracy of which appellant was a part. *See* United States Sentencing Commission, *Guidelines Manual,* § 2B1.1 ("Larceny, Embezzlement, and Other Forms of Theft") (Oct.1987); U.S.S.G. § 1B1.3, comment. (n.1) ("relevant conduct" for sentencing includes "conduct in furtherance of the conspiracy that was known to or was reasonably foreseeable by the defendant"). The Guidelines provide for a six level increase for a loss between $20,000 and $50,000. The record contains evidence of checks issued on the basis of false application information, which were cashed by the appellant, and which total $44,000 in amount. This evidence is more than sufficient to warrant a six level increase. *See United States v. Wright,* 873 F.2d 437, 443–44 (1st Cir.1989) (clearly erroneous standard of review of sentencing court's fact finding).

11. *Custody.* Appellant argues that the court, instead of having her taken into custody, should have allowed her to surrender herself at a later time. Appellant has now served most of her sentence. The issue is moot.

The judgment of the district court is *Affirmed.*