USCA1 Opinion

 

 United States Court of Appeals
 For the First Circuit

No. 98-1664

 UNITED STATES OF AMERICA,

 Appellee,

 v.

 PATRICK M. VIGNEAU,

 Defendant, Appellant.

 APPEAL FROM THE UNITED STATES DISTRICT COURT

 FOR THE DISTRICT OF RHODE ISLAND

 [Hon. Ronald R. Lagueux, U.S. District Judge]

 Before

 Boudin, Circuit Judge,
 
 Campbell, Senior Circuit Judge,
 
 and Lipez, Circuit Judge.
 
 
 
 
 Roger W. Milne, by appointment of the court, for appellant.
 Donald C. Lockhart, Assistant United States Attorney, with
whom Margaret C. Curran, United States Attorney, was on
consolidated brief for the United States.

July 22, 1999

 
 

 BOUDIN, Circuit Judge. Two brothers, Patrick and Mark
Vigneau, were convicted after a lengthy trial on charges growing
out of their participation in a drug distribution scheme. In this
opinion, we consider Patrick Vigneau's claims of error; a companion
decision in No. 98-1632 addresses Mark Vigneau's appeal. Based on
its verdict, the jury apparently accepted the government's version
of events, which we summarize at the outset. Patrick Vigneau does
not challenge the sufficiency of the evidence.
 From around February 1995 to at least the end of that
year, Patrick Vigneau and Richard Crandall conducted a venture to
acquire marijuana and steroids in the Southwest and resell them in
the Northeastern United States. Crandall obtained the marijuana
and steroids from suppliers in El Paso, Texas, and in Mexico, and
sent the drugs to Patrick Vigneau in Rhode Island and southeastern
Massachusetts. Patrick Vigneau, who distributed the drugs to
retail dealers, used others to assist him, including his brother
Mark Vigneau and one Joseph Rinaldi. 
 Some of the proceeds from these Northeastern sales had to
be sent to Crandall in Texas so that he could pay suppliers and
share in the profits. Patrick Vigneau transmitted funds to
Crandall primarily through Western Union money orders. The money
orders were sent by Patrick Vigneau or others, sometimes in the
sender's true name but often using false or borrowed names. 
Timothy Owens, who assisted Crandall in acquiring drugs, frequently
picked up the checks from Western Union, cashed them, and gave the
money to Crandall.
 Although some of the drugs were mailed from Texas to
Rhode Island or sent through commercial delivery services, Patrick
Vigneau and Crandall sought to transport larger quantities over the
road. To this end, they purchased two vans in El Paso in March
1995, and registered one in Patrick's name and the other in
Crandall's name. Shortly thereafter, Crandall and Owens used the
van registered in Patrick's name to deliver marijuana to Rhode
Island. They also used U-Haul trucks filled with cheap furniture 
and concealed the marijuana, which was shrink-wrapped in plastic,
behind the furniture. Eventually the authorities gained some
knowledge of the scheme.
 In September 1995, the DEA intercepted an Airborne
Express package with several pounds of marijuana and some steroids
addressed to a "David Weiber" at 2 Lyon Avenue in East Providence,
Rhode Island, an address at which Patrick's wife Donna Vigneau
(legally separated from him) was living and with which Patrick was
otherwise connected. On September 8, 1995, law enforcement
officers secured a warrant to search the first floor of 2 Lyon
Avenue and Patrick's van, which was parked outside. The officers
seized mildly incriminating materials from the residence, and more
incriminating materials, including a pocket organizer/drug ledger,
from the van.
 In December 1995, Owens and one Randy Panahi were making
a U-Haul delivery of marijuana to Patrick Vigneau when they were
halted by the Missouri Highway Patrol. After the Highway Patrol
discovered the drugs, both men agreed to cooperate secretly with
the DEA. Thereafter and perhaps as a result, the authorities
secured Crandall's cooperation. He then arranged to meet with
Patrick Vigneau in a Boston hotel on December 28, 1995. Federal
agents recorded the meeting on videotape.
 In this meeting with Crandall, Patrick Vigneau discussed
with Crandall how to continue operations now that the authorities
had discovered the U-Haul technique. Although Patrick Vigneau knew
that Owens and Panahi were now cooperating with the agents, he did
not know that Crandall was doing so as well. During the recorded
discussion, Patrick Vigneau referred to his brother Mark Vigneau on
several occasions, reporting to Crandall Mark's supposed view that
the "best . . . way is the train" and that Mark was "not out . . .
I'd rather have him out." The recording was later introduced into
evidence against both brothers at trial.
 In May 1997, the grand jury issued a sealed indictment
charging Patrick and Mark Vigneau with numerous offenses. Also
indicted were Donna Vigneau, Timothy Owens, Joseph Rinaldi, Randy
Panahi and one Kyle Robson. Patrick Vigneau was charged with
participation in a continuing criminal enterprise, various
marijuana offenses, two conspiracies to distribute drugs, and to
launder the proceeds, and numerous individual money laundering
counts. In due course, the indictment was unsealed and various
suppression motions were heard in 1997 and early 1998.
 In early 1998, Patrick Vigneau was tried with Mark
Vigneau and others in a lengthy trial. Panahi and Owens pled
guilty to conspiracy to distribute marijuana and testified for the
government. The government dismissed a similar charge against
Donna Vigneau. The jury convicted Patrick Vigneau, Mark Vigneau
and Joseph Rinaldi (who has chosen not to appeal) on various
counts, and acquitted Kyle Robson. Crandall separately pled guilty
to a marijuana conspiracy charge, and his sentence was later
upheld. United States v. Crandall, CA No. 98-1669 (1st Cir. 1999).
 At trial, the government relied on the testimony of over
20 witnesses, including Owens and Panahi (who described at length
the scheme and their dealings with Patrick Vigneau), and on
physical evidence, including seized drugs, the December 1995
videotape, Western Union money transfer records, telephone records
revealing much communication between the coconspirators, tax
records establishing a lack of other income, and various items
seized in the September 1995 search of the 2 Lyons Avenue apartment
and white van, including the drug ledger. Crandall was not called
to testify. The defendants cross-examined witnesses but did not
put on evidence of their own, save for Robson, who testified in his
own defense and gave evidence against Patrick Vigneau. 
 The jury convicted Patrick Vigneau of participating in a
continuing criminal enterprise, 21 U.S.C. 848; possession of
marijuana and attempted possession of marijuana (both with intent
to distribute) and conspiracy to distribute marijuana, id. 841,
846; and 21 counts of money laundering on specific occasions and
conspiracy to launder money, 18 U.S.C. 1956. Patrick Vigneau was
later sentenced to 365 months in prison. He now appeals,
challenging his conviction but not his sentence.
 On this appeal, Patrick Vigneau's strongest claim is that
the district court erred in allowing the government to introduce,
without redaction and for all purposes, Western Union "To Send
Money" forms, primarily in support of the money laundering charges. 
These forms, as a Western Union custodian testified, are handed by
the sender of money to a Western Union agent after the sender
completes the left side of the form by writing (1) the sender's
name, address and telephone number; (2) the amount of the transfer;
and (3) the intended recipient's name and location. The Western
Union clerk then fills in the right side of the form with the
clerk's signature, date, amount of the transfer and fee, and a
computer-generated control number; but at least in 1995, Western
Union clerks did not require independent proof of the sender's
identity.
 Western Union uses the control number affixed by the
clerk to correlate the information on the "To Send Money" form with
the corresponding "Received Money" form and with the canceled check
issued by Western Union to pay the recipient. The original forms
are usually discarded after six months, but the information
provided by the sender, as well as the information from all records
associated with the money transfer, are recorded in a computer
database. In this case, for some transfers the government had the
forms completed by the sender, but for most it had only the
computer records.
 The government introduced over 70 records of Western
Union money transfers. Patrick Vigneau's name, address and phone
number appeared as that of the sender on 21 of the "To Send Money"
forms (11 other names, including fictional names and those of Mark
Vigneau and of other defendants, appeared as those of the senders
on the other forms), and those 21 forms corresponded to the 21
specific counts of money laundering on which Patrick Vigneau was
ultimately convicted by the jury. Patrick Vigneau's most plausible
objection, which was presented in the district court and is renewed
on appeal, is that his name, address and telephone number on the
"To Send Money" forms were inadmissible hearsay used to identify
Patrick Vigneau as the sender.
 Hearsay, loosely speaking, is an out-of-court statement
offered in evidence to prove the truth of the matter asserted. 
Fed. R. Evid. 801(c). Whoever wrote the name "Patrick Vigneau" on
the "To Send Money" forms was stating in substance: "I am Patrick
Vigneau and this is my address and telephone number." Of course,
if there were independent evidence that the writer was Patrick
Vigneau, the statements would constitute party-opponent admissions
and would fall within an exception to the rule against hearsay,
Fed. R. Evid. 801(d)(2) (the rule says admissions are "not
hearsay," but that is an academic refinement). However, the
government cannot use the forms themselves as bootstrap-proof that
Patrick Vigneau made the admission.
 Instead, the government argues that the "To Send Money"
forms and the computerized information reflecting those forms and
the correlated material were admissible under the business records
exception. Fed. R. Evid. 803(6). Rule 803(6) provides that
business records are admissible where shown to be business records
by a qualified witness, "unless the source of information or the
method and circumstances of preparation indicate lack of
trustworthiness." Id. The district judge accepted the view that
the Western Union records were trustworthy and admitted the "To
Send Money" forms (or equivalent computer records) without
redaction and for all purposes, advising the jury that "[w]hat
weight you give to them will be your choice."
 The district judge was correct that the "To Send Money"
forms literally comply with the business records exception because
each form is a business record, and in this case, the computer
records appeared to be a trustworthy account of what was recorded
on the original "To Send Money" forms. The difficulty is that
despite its language, the business records exception does not
embrace statements contained within a business record that were
made by one who is not a part of the business if the embraced
statements are offered for their truth. The classic case is
Johnson v. Lutz, 170 N.E. 517 (N. Y. 1930), which excluded an
unredacted police report incorporating the statement of a bystander
(even though the police officer recorded it in the regular course
of business) because the informant was not part of that business. 
The Advisory Committee Notes to Rule 803(6) cite Johnson v. Lutz
and make clear that the rule is intended to incorporate its
holding.
 Johnson v. Lutz is not a technical formality but follows
directly from the very rationale for the business records
exception. When a clerk records the receipt of an order over the
telephone, the regularity of the procedure, coupled with business
incentives to keep accurate records, provide reasonable assurance
that the record thus made reflects the clerk's original entry. 
Thus the business record, although an out-of-court statement and
therefore hearsay, is admitted without calling the clerk to prove
that the clerk received an order. See generally 2 McCormick on
Evidence 286 (4th ed. 1992).
 But no such safeguards of regularity or business checks
automatically assure the truth of a statement to the business by a
stranger to it, such as that made by the bystander to the police
officer or that made by the money sender who gave the form
containing his name, address, and telephone number to Western
Union. Accordingly, the Johnson v. Lutz gloss excludes this
"outsider" information, where offered for its truth, unless some
other hearsay exception applies to the outsider's own statement. 
This gloss on the business records exception, which the Federal
Rules elsewhere call the "hearsay within hearsay" problem, Fed. R.
Evid. 805, is well-settled in this circuit. Other circuits are in
accord. See 5 Weinstein's Federal Evidence, supra, 803.11[4] at
803-72 to 803-73 & n.29.
 Of course, "hearsay within hearsay" is often trustworthy
but hearsay is not automatically admissible merely because it is
trustworthy. A residual hearsay exception exists based on case-
specific findings of trustworthiness, but it is more stringent and
requires, among other things, advance notice not here provided by
the government. Fed. R. Evid. 807 (combining former Fed. R. Evid.
803(24) and Fed. R. Evid. 804(b)(5)). And precisely because
hearsay law is now codified for the federal courts, the former
freedom of federal judges to create new exceptions is now
curtailed. Fed. R. Evid. 807 and Fed. R. Evid. 803(24), 1974
Advisory Committee Notes to 1974 Enactment.
 Nor does the reference to "trustworthiness" in the
business records rule comprise an independent hearsay exception. 
Fed. R. Evid. 803(6). That reference was not designed to limit
Johnson v. Lutz to untrustworthy statements--after all, the
statement to the police officer was probably trustworthy--but
rather to exclude records that would normally satisfy the business
records exception (e.g., the clerk's computerized record of calls
received) where inter alia the opponent shows that the business
record or system itself was not reliable (e.g., the computer was
defective). See generally United States v. Moore, 923 F.2d 910,
914-15 (1st Cir. 1991).
 Of course, in some situations, the statement by the
"outsider" reflected in the business record may be admissible not
for its truth but for some other purpose, but the disputed "To
Send Money" forms here were admitted by the district court for all
purposes, including as proof of the sender's identity. Possibly,
the government could have argued as to Patrick Vigneau (it would be
harder as to Mark) that other evidence of Patrick Vigneau's
activities comprised circumstantial evidence that would permit a
jury to conclude that he sent the specific forms bearing his name,
Fed. R. Evid. 104(b); but apart from the need for a limiting
instruction, Fed. R. Evid. 105, this presents a difficult issue
that has not been argued and is not here resolved.
 No doubt, the "To Send Money" forms were relevant to the
government's case regardless of whether Patrick Vigneau (or any
other named sender) was the person who made an individual transfer: 
they showed transfers of money from Rhode Island directed to
Crandall and others that tended to support the general description
of the drug and money laundering activities described by the
government's witnesses. Thus, the forms could have been offered in
redacted form, omitting the information identifying Patrick Vigneau
as the sender of 21 of the forms. But that is not what happened.
 Some cases have admitted under the business records
exception "outsider" statements contained in business records, like
the sender's name on the Western Union form, where there is
evidence that the business itself used a procedure for verifying
identity (e.g., by requiring a credit card or driver's license). 
Probably the best analytical defense of this gloss is that in such
a case, the verification procedure is circumstantial evidence of
identity that goes beyond the mere bootstrap use of the name to
establish identity. While this gloss may well represent a
reasonable accommodation of conflicting values, verification was
not Western Union's practice at the time.
 The hearsay rule is an ancient and, even to most lawyers,
a counter-intuitive restriction now riddled with many exceptions. 
However, the drafters chose to retain the hearsay rule, 5
Weinstein's Federal Evidence, supra, 802App. 100, at 802App.-4 to
802App.-5, and any trial lawyer who has tried to cross-examine a
witness whose story depends on the hearsay statements of others
understands why. These are reasons enough to tread cautiously,
quite apart from the Supreme Court's intermittent reliance on the
Confrontation Clause to make the use of hearsay a potentially
constitutional issue in criminal trials. See 2 McCormick on
Evidence, supra, 252, at 126-29.
 We thus conclude, in accord with the Tenth Circuit,
United States v. Cestnik, 36 F.3d 904, 908 (10th Cir. 1994), cert.
denied, 513 U.S. 1175 (1995), that the sender name, address and
telephone number on the forms should not have been admitted for
their truth. There is no plausible claim of harmless error, United
States v. Shea, 159 F.3d 37, 40-41 (1st Cir. 1998), cert. denied,
119 S. Ct. 1480 (1999), as to 18 of the money laundering counts
where, as here, the government might well have had difficulty in
tying Patrick Vigneau to any of these 18 specific transactions
except through the hearsay statements themselves.
 The issue is much more difficult as to the three
remaining transmissions. For two of them, it appears that the
sender's copy of the "To Send Money" forms were among the papers
seized from Patrick Vigneau's van, where they were in a suitcase
together with other papers connected with Patrick Vigneau. This,
we believe, was sufficient circumstantial evidence specific to
these documents to allow a jury to conclude that the sender
information was indeed an admission by Patrick Vigneau, curing the
hearsay problem. United States v. Black, 767 F.2d 1334, 1341-42
(9th Cir.), cert. denied, 474 U.S. 1022 (1985). We note that the
government has not supplied us with records that would establish
beyond all doubt that the two slips do correspond to counts of the
indictment.
 The independent evidence as to the third transaction is
somewhat thinner but still distinguishes it from the other 18. At 
trial, the government asked Owens about his memory of a transfer
occurring on one of the dates charged as a money laundering count. 
Owens said not only that he remembered the transfer but that
Crandall had told him that Patrick Vigneau was the sender. This
double hearsay statement might well come in under the co-
conspirator exception, although the force of the proof is weakened
because we have no idea of the basis for Crandall's statement that
Patrick Vigneau was the sender.
 Nevertheless, we cannot find the unqualified admission of
the computer records harmless even as to these three transactions. 
While we are inclined to think that a jury would likely have
accepted the slips in the van as reflecting transactions by Patrick
Vigneau, the defense never had reason to argue the point--and
argument was possible--since all of the Western Union records
themselves were admitted for all purposes, including identification
of the sender. In addition, given limited familiarity with the
exhibits, we are somewhat uncomfortable with rescuing these three
counts based on a line of argument never articulated by the
government.
 Our conclusion is otherwise as to Patrick Vigneau's
conviction for conspiracy to engage in money laundering. True, the
admission of computer records as to the 21 transactions where
Patrick Vigneau was recorded as the sender was powerful evidence on
the conspiracy to launder count. But whereas conviction on the
specific transaction counts required a jury to find in each case
that Patrick Vigneau had made the specific transaction on the
specific date, no such proof was required to convict him on the
conspiracy to launder count; and the independent evidence that
Patrick Vigneau conspired to launder was extremely strong, at least
on a cumulative basis.
 That evidence included direct testimony by Owens and
Panahi that the drug smuggling scheme--of which Patrick Vigneau was
a central figure--also involved remittance of funds from Rhode
Island to Texas by means of Western Union money orders; indeed,
Owens testified that on one specific occasion, Patrick Vigneau
assured him after delivery that the payments to Panahi would be
made. Western Union records showing transfers from Rhode Island
locations to Crandall were clearly admissible without regard to the
sender information as circumstantial evidence that someone was
sending funds, and was supported by Owens' own declarations of his
role of picking up the Western Union checks in Texas. There is
even a brief reference to Patrick Vigneau on the videotape
regarding the use of Western Union to transfer funds, although it
is quite cryptic.
 Thus, substantial evidence indicated that fund transfers
were being made incident to the drug smuggling; and Patrick
Vigneau's connection to the money laundering scheme was confirmed
by his location, his specific promises to Panahi, his videotaped
admission and by the Western Union "To Send Money" slips in his van
(which reinforce the basic inference even if not treated as an
independent guarantee of conviction for these specific
transactions). We think it thus "highly probable" that the
conspiracy to launder conviction would have followed, even without
the disputed computer records. Shea, 159 F.3d at 40. 
 The inadmissible hearsay evidence also does not warrant
reversal of the counts charging Patrick Vigneau with possession,
attempt and conspiracy to distribute marijuana. No doubt proof of
his money laundering reinforced these counts as well, but this
evidence was dwarfed by the extensive direct and corroborating
evidence that Patrick Vigneau was engaged in a drug smuggling
scheme. Similarly, the forms were harmless as to the continuing
criminal enterprise conviction, because the drug smuggling
activities were treated as the predicate acts to establish a
continuing criminal enterprise. 21 U.S.C. 848. Thus, only the
21 individual money laundering convictions must be set aside.
 The other difficult issue presented in Patrick Vigneau's
appeal concerns the district court's denial of his motion to
suppress evidence seized in the September 8, 1995, search of the
apartment at 2 Lyon Avenue and from the white Chevrolet van parked
outside. The evidence seized at 2 Lyon Avenue principally
concerned Donna Vigneau and even as to her was only somewhat
incriminating but the items taken from the van were more potent: 
they included Western Union "To Send Money" forms and the personal
organizer/drug ledger. A summary of the events leading up to the
seizures is critical to understanding the claim of error.
 On September 8, 1995, an East Providence police officer
applied for a search warrant that on its face unconditionally
permitted the search of the first floor apartment at 2 Lyon Avenue
and a white Chevrolet van identified by its license plate for
marijuana and other items relating to drug trafficking. However,
the affidavit attached to the warrant explained that the Drug
Enforcement Administration had intercepted a package being shipped
by Airborne Express to "David Weiber" at 2 Lyon Avenue that was
found to contain marijuana and anabolic steroids. The affidavit
continued:
 This package has been resealed and will be
 delivered by an undercover police officer
 posing as an Airborne Express deliveryman. 
 Execution of this search warrant will not take
 place until approximately (10) to (15) minutes
 after delivery has been made.

 After issuance of the warrant, the police that same day
attempted to deliver the package around noon to 2 Lyon Avenue but
encountered a note on the door stating: "Leave package here--be
back in 15 min; Donna V." The police did not leave the package but
kept watch on the property until about three hours later when, to
their surprise, a flatbed truck arrived and began to tow away the
van. The police then left the package at the door, waited a brief
period, and then entered and searched the house. They also
intercepted the tow truck and seized and searched the van.
 After a suppression hearing, the district court upheld
the search. It held that the warrant was an anticipatory warrant
that was facially invalid because the "triggering event" for
executing the warrant (delivery of the package) was set forth only
in the affidavit, but it ruled that the warrant was supported by
probable cause, that the officers acted in good faith, and that the
triggering event, although not described in the warrant, had in
fact occurred prior to the search of the house. As to the van, the
court likewise found that the seizure was supported by probable
cause and conducted in good faith (and further that the search of
the van was justified by exigent circumstances).
 At trial the seized evidence was admitted, and Patrick
Vigneau now claims this to have been error. The government argues
(contrary to the district judge's finding) that Patrick Vigneau had
no standing to object to the search of the house and that the
evidence in question did not affect the outcome. The government
also argues, supported by uniform circuit law across the circuits,
that an anticipatory warrant is valid even if the triggering
condition is set forth only in the attached affidavit, so long as
the condition is actually met. Our own view is that the warrant
was valid without regard to the condition, mooting the other issues
such as standing and harmless error.
 Conditional warrants have been upheld where satisfying
the condition provided a necessary link in establishing some
element of probable cause, e.g., that the recipient of a package
containing drugs or child pornography expected its arrival. United
States v. Gendron, 18 F.3d 955, 965 (1st Cir.), cert. denied, 513
U.S. 1051 (1994). But in this case, leaving the package at the
door did nothing to establish probable cause to search the
premises--it was not received by anyone inside the premises--so any
concern about whether the condition was satisfied or adequately set
forth in the warrant is beside the point.
 As it happens, probable cause existed to search the
premises without delivery of the package. The affidavit asserted
that a Warwick, Rhode Island, police detective was familiar with
one of the residents at 2 Lyon Avenue, Patrick Vigneau; that he was
known to traffic in narcotics and was also known to use his vehicle
to transport narcotics; that electricity service at the house was
in the name of Donna Vigneau and there was no "David Weiber" listed
anywhere on Lyon Avenue; that the van parked outside was registered
to Patrick Vigneau, who had also been seen entering and exiting the
first floor apartment; and that another package (contents
unidentified) addressed to Donna and Patrick Vigneau at the 2 Lyon
Avenue address was being shipped there from Texas via Federal
Express.
 This information standing alone tied Patrick Vigneau to
the apartment and the vehicle, but the critical addition was the
further statement--also reported in the affidavit--that the DEA had
intercepted a package containing marijuana and steroids directed to
"David Weiber" at 2 Lyon Avenue. There being reason to believe
that no such person resided at that address, the Airborne Express
package dovetailed with the general report that Patrick Vigneau was
a drug dealer and suggested at least a fair probability that he was
using the 2 Lyon address to cache his drugs. This is enough for a
warrant. See generally United States v. Owens, 167 F.3d 739, 746
(1st Cir. 1999); United States v. Procopio, 88 F.3d 21, 28 (1st
Cir. 1996), cert. denied, 519 U.S. 1046 (1996).
 Admittedly, the claim is slightly weaker as to the van
than as to the house, since the package in question was addressed
only to the house. But the general report from a police detective
that Patrick Vigneau used his van to distribute drugs was entitled
to some weight and, where the van was parked outside the house to
which drugs were being sent, the sum total of the information
created at least a likelihood that Patrick Vigneau used the van for
drug distribution and that evidence might reasonably be expected to
be found within. All that is required is a "fair probability." 
Ricciardelli, 998 F.2d at 10-11 (quoting Illinois v. Gates, 462
U.S. 213, 238 (1983)).
 Patrick Vigneau also objects to the 1997 search of his
apartment at 25 Kulas Street in West Warwick, Rhode Island, on the
ground that the information in that warrant was stale. In that
seizure, the only evidence later admitted at trial was the personal
organizer/drug ledger; as already noted, it had been seized from
Patrick's van in 1995 and then returned to him after being
photocopied by the police. See note 1, above. Thereafter, the
five pages claimed to comprise the drug ledger had been torn out. 
At trial, the jury therefore had both the photocopies made in 1995
of the five pages and the 1997 organizer without those pages. 
 Although the district court rejected the staleness claim
and upheld the 1997 warrant, we need not address the merits of this
ruling. The five pages seized in 1995 were as part of the pocket
organizer enough of a drug ledger to bolster significantly the
government's case. The added inferences that someone (likely
Patrick Vigneau) had sought to destroy this evidence after the
organizer was returned added relatively little in the context of
the other evidence against Patrick Vigneau. If it was error to
admit the 1997 seizure with the torn-out pages (an issue that we do
not decide), it was patently harmless in light of the properly
admitted photocopies of those pages derived from the 1995 seizure. 
Shea, 159 F.3d at 40.
 Patrick Vigneau's remaining claims of error are not
substantial. The first concerns the videotape, admitted into
evidence over objection, which contained a discussion between
Patrick Vigneau and Crandall on December 28, 1995. During the
conversation, Patrick Vigneau made a number of statements the jury
could reasonably have interpreted as confirming his participation
in a drug conspiracy. Although Crandall was now working secretly
for the government and was no longer a co-conspirator, Patrick
Vigneau's own statements were admissions, and the court told the
jury that Crandall's statements were not to be considered for their
truth. 
 Patrick Vigneau now objects that the recorded
conversations were confusing and should have been excluded under
Rule 403, and he points to oblique language in the recording--not
surprising in criminal conversations--and potential ambiguities. 
However, even if the objection was preserved (which the government
disputes), the district judge certainly did not abuse his
discretion in determining that the relevance outweighed potential
confusion. United States v. Panzardi-Lespier, 918 F.2d 313, 318
(1st Cir. 1990). Since Crandall's statements were not admitted for
their truth, there is nothing to the suggestion that the
Confrontation Clause was implicated by the failure to call Crandall
as a witness to explain what he meant in his own questions or
comments.
 The next claim of error involves the trial court's
refusal to strike a purportedly non-responsive and prejudicial
answer. Patrick Vigneau extensively cross-examined the government
agent about the government's debriefing of Crandall and sought to 
elicit information about Crandall's criminal history. Defense
counsel pressed the agent to admit that even in debriefing Crandall
was dishonest, and after securing the admission counsel inquired
again, "He [Crandall] held back?". This elicited the following
response:
 If your getting -- if you want me to say that
 he's a liar, yes, he is. He lied to the
 Government, and Mr. Rose and myself felt that
 we would rather take our chances with Owens
 and Panahi to present this case because they
 did not lie to us, And because we did not
 choose to use Mr. Crandall, we lost a lot of
 evidence in this case.

The court refused to strike the answer as non-responsive and later
denied a defense motion for mistrial based on the same testimony.
 To say that Crandall was a liar would hardly hurt Patrick
Vigneau, so the concern is with two other statements: that Owens
and Panahi "did not lie to us," which Patrick Vigneau asserts is
equivalent to improper vouching by the prosecutor, and the
implication that Crandall had "a lot of evidence" that the
government did not have a chance to use; this, says Patrick
Vigneau, amounts to a prosecutor vouching and also relying on
information "other than that which has been presented in court." 
Patriarca v. United States, 402 F.2d 314, 321 (1st Cir. 1968),
cert. denied, 393 U.S. 1022 (1969).
 While government agents are not prosecutors, they
sometimes have more knowledge of what should and should not be said
than a typical lay witness. And one could argue about the district
court's judgment that the complained-of statements--as opposed to
the "he's a liar" rhetoric--was fairly responsive to the question. 
But there was no misconduct by the prosecutor, and about the most
Patrick Vigneau could properly have received was a direction from
the jury to disregard the remarks. The failure to give that
direction in this case, even if regarded as error, is patently
harmless, Shea, 159 F.3d at 40, for fairly obvious reasons.
 The statement that Owens and Panahi had not lied to the
investigators was a single brief reference and can hardly have
mattered very much to the jury in assessing the credibility of two
witnesses who were deeply involved in criminal activity and who
were present for cross-examination and impeachment by defense
counsel. As for the "lost a lot of evidence" reference, the jury
already knew that Crandall could have testified about the Texas end
of the conspiracy; given the overwhelming evidence against Patrick
Vigneau on the drug charges, the likelihood that the jury gave any
further weight to the "a lot of evidence" statement is too small to
be troubling.
 Patrick Vigneau also complains that there were two one-
month long continuances during the trial. One, which was beyond
anyone's control, occurred early in the trial and was due to a
juror's illness; the subsequent delay was due to a break from
January 12 through February 10, 1998, because of a scheduled
vacation of the judge. None of the defendants objected to the
continuances when they were proposed but, when court reconvened
following the second continuance, Patrick Vigneau moved for a new
trial based on the cumulation of delays.
 Counsel was advised in advance that the vacation break
would be for 30 days and did not object until after the trial was
recommenced in February 1998. This amounts to mouse-trapping and
suggests review only for plain error which is extremely hard to
establish. United States v. Olano, 507 U.S. 725, 732-37 (1993). 
In any event, only the most egregious showing of harm could justify
the belated motion challenging a decision on trial management. The
largely speculative claims of prejudice here offered by Patrick
Vigneau do not even come close. 
 Finally, Patrick Vigneau objects to the government's plea
agreements with Owens and Pinahi, claiming that the consideration
they received for their testimony violated 18 U.S.C. 201(c)(2),
as construed in United States v. Singleton, 144 F.3d 1343 (10th
Cir. 1998). The objection was not preserved in the district court,
and in any event, the Tenth Circuit later vacated the decision. 
United States v. Singleton, 165 F.3d 1297, 1298 (10th Cir. 1999)
(en banc), cert. denied, 1999 WL 185874 (Jun. 21, 1999) (No. 98-
8758). Finally, we have recently rejected the position taken in
the original Singleton decision. United States v. Lara, 1999 WL
431140, at *9 (1st Cir. June 30, 1999).
 Patrick Vigneau's conviction for participation in a
continuing criminal enterprise and his convictions on each of the
drug counts, including conspiracy to distribute marijuana, and his
conviction for conspiracy to launder money are affirmed; his
convictions for 21 counts of money laundering are vacated without
prejudice to new trial on those counts; and the sentence is vacated
and the case is remanded for resentencing.
 It is so ordered.