**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**APR 10 2003**

**PATRICK FISHER**
**Clerk**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

UNITED STATES OF AMERICA,

      Plaintiff-Appellee,

v.

LAWRENCE ERNEST STROUD,

      Defendant-Appellant.

No. 02-1347
(District of Colorado)
(D.C. No. 00-CR-260-N)

**ORDER AND JUDGMENT**[*]

Before **SEYMOUR**, **MURPHY**, and **O'BRIEN**, Circuit Judges.

After examining the briefs and appellate record, this panel has determined unanimously to grant the parties' request for a decision on the briefs without oral argument. *See* Fed. R. App. P. 34(f); 10th Cir. R. 34.1(G). The case is therefore ordered submitted without oral argument.

---

[*]This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. The court generally disfavors the citation of orders and judgments; nevertheless, an order and judgment may be cited under the terms and conditions of 10th Cir. R. 36.3.

## I. INTRODUCTION

Defendant Lawrence Stroud ("Stroud") was convicted by a jury of assault within the maritime and territorial jurisdiction of the United States, in violation of 18 U.S.C. § 113(a)(6). The district court sentenced Stroud to 96 months' imprisonment and three years of supervised release. Stroud argues on appeal that the district court erred in denying his motion to suppress statements made to the Federal Bureau of Investigation ("FBI") during its inquiry into the assault. Stroud also contends that the district court erred in allowing the government to impeach a defense witness with the witness' mental health history. Exercising jurisdiction pursuant to 28 U.S.C. § 1291, this court **affirms**. The statement Stroud challenges as involuntary was made prior to any allegedly misleading comment by FBI investigators concerning the sentencing guidelines. In addition, even if the district court erred in admitting impeachment testimony concerning the mental health history of a witness, the error was harmless.

## II. BACKGROUND

Stroud was an inmate at the Federal Correctional Institution ("FCI") in Englewood, Colorado. On May 4, 2000, Stroud got into an argument with his cellmate, Marlo Pittman ("Pittman"), over Pittman smoking a cigar in their cell. Stroud testified that when he asked Pittman and two other inmates to "take the

cigar elsewhere," Pittman and the two inmates lifted their shirts so that Stroud could see the homemade knives or "shanks" placed in their waistbands.

Stroud testified that early the next morning, he heated water in the microwave in order to make coffee. He stated that upon returning to his cell, Pittman confronted him with a knife and made threatening statements. In response, Stroud threw the cup of hot water at Pittman.

In contrast, Pittman testified that he was sleeping at the time of the incident and did not confront Stroud. He stated that he woke up in pain with Stroud swinging at him. Stroud then chased Pittman to the bathroom area. Pittman stated that Stroud continued to swing at him and landed a blow just before officers restrained Stroud. Pittman testified that he returned to his cell and, shortly thereafter, an officer noticed that he had been burned. Pittman was treated by a physician's assistant at FCI and was then transferred to a hospital for medical treatment. Pittman suffered partial thickness burns on the right side of his face, his shoulders, the right side of his neck, and his left arm.

During an investigation of the incident, two FBI agents interviewed Stroud in a large conference room located in a facility at the FCI separate from where Stroud was housed. Agent James Berry ("Agent Berry") had Stroud read aloud from the *Miranda* rights advisement form. Stroud refused to sign the form but agreed to talk with the agents and stated that he did not require an attorney.

During the interview, Stroud explained what had taken place on May 4, 2000. Specifically, as Agent Berry's report noted:

> Stroud stated that he felt scared and threatened after the confrontation with Pittman, [and the other two inmates]. He began thinking of ways to get out of the situation, and felt that some sort of retaliation against Pittman would be necessary; thereby preventing Pittman from injuring him. Stroud advised that if he voluntarily went to the Segregated Housing Unit (SHU) he would be considered a "snitch." Stroud stated that the retaliation "Had to be bad enough so I or the other person never hit the compound." In addition, Stroud stated "I had to have a way out without killing somebody," and "Could put dirt on myself and get out unscathed."

After describing the events that occurred on the evening before the early morning incident, Stroud declined to further discuss the matter. At that point, Agent Berry stated that acceptance of responsibility could potentially benefit Stroud at sentencing. Agent Berry mentioned the possible reduction in order to obtain specific details concerning Pittman's injuries. Stroud refused to provide further details about the incident, except to mention that he intended to hit Pittman in front of officers so that he could be placed in the Segregated Housing Unit ("SHU").

On June 21, 2000, Stroud was indicted on one count of assault within the maritime and territorial jurisdiction of the United States. Prior to trial, Stroud filed a motion to suppress the statements made to FBI agents during the assault

-4-

investigation on the basis that his statements were not voluntary. In support, he claims he did not sign the *Miranda* rights advisement form and the interrogation atmosphere was coercive. The district court denied Stroud's motion to suppress. The court found Stroud's statements to be mostly exculpatory and noted that Stroud was not admitting to causing or having knowledge about Pittman's injuries. The court also found Agent Berry's statements to Stroud concerning the acceptance of responsibility sentencing adjustment were misleading. The court, however, determined that Stroud did not "give in and tell the agent the whole story." The court concluded that Stroud was given the *Miranda* warning and that his statements were voluntary.

On February 11, 2002, Stroud was tried before a jury. At trial, Stroud called Samuel Robinson ("Robinson"), a fellow inmate in the SHU, as a defense witness. During cross-examination, the government asked whether Robinson had past mental problems. Stroud objected and noted that "[t]here ha[d] been no suggestion [Robinson was] not competent to testify." The district court overruled Stroud's objection. Robinson then testified about his prior hospitalizations for depression and his current and past medications for manic depression and depression. Robinson also stated that an evaluation revealed that he did not suffer from diminished capacity.

The jury found Stroud guilty on the assault charge. The district court sentenced him to 96 months' imprisonment with three years of supervised release.

## III. DISCUSSION

### A. Voluntariness of Statements

Stroud alleges that the district court erred in denying his motion to suppress the statements made to the FBI because such statements were involuntarily made. This court reviews the voluntariness of incriminating statements *de novo*. *United States v. Short*, 947 F.2d 1445, 1449 (10th Cir. 1991). Underlying factual findings by the district court, however, are subject to review under the clearly erroneous standard. *United States v. Lugo*, 170 F.3d 996, 1003 (10th Cir. 1999). In an appeal of the district court's denial of the defendant's motion to suppress, this court reviews the evidence in the light most favorable to the government. *Short*, 947 F.2d at 1449.

To determine whether the defendant's statements were voluntarily made, this court must "examine the entire record and make an independent determination of the ultimate issue of voluntariness." *Lugo*, 170 F.3d at 1004. Voluntariness is determined from the totality of the circumstances. *Clanton v. Cooper*, 129 F.3d 1147, 1158 (10th Cir. 1997). This court examines several factors, including:

> (1) the defendant's age, intelligence, and education;
> (2) the length of the detention and interrogation; (3)
> the length and nature of the questioning; (4) whether
> the defendant was advised of his constitutional

rights; and (5) whether the defendant was subjected to or threatened with any physical punishment.

*Lugo*, 170 F.3d at 1004. "No single factor is determinative." *Id.*

Upon reviewing the record and giving the appropriate deference to the district court's factual findings, this court concludes that Stroud's statements were voluntary. At the time of the interview, Stroud was not "unusually susceptible to coercion" because of his age, intelligence, or education. *Id.* In fact, Stroud was over thirty years old, had received his GED, and had prior experience with the criminal justice system. In addition, the interview took place at the FCI where Stroud was serving a separate term of imprisonment. Although he was handcuffed and shackled during the interview, Stroud was placed in the handcuffs and shackles in order to transport him to a more accommodating interview room within the institution. The interview was short in duration, lasting no more than 45 minutes. Also, Stroud concedes on appeal that he was properly advised of his *Miranda* rights during the interview. Moreover, Stroud's refusal to sign the waiver form while orally agreeing to speak with the agents in the absence of an attorney does not weaken the *Miranda* advisement. *See id.* at 1004-05 (noting that a defendant's waiver of *Miranda* rights is not invalidated because the waiver is oral rather than written). Finally, Stroud was not subjected to physical punishment during the interview.

Stroud, however, argues that the statements obtained during the interview were the result of coercion or deception because the interviewing FBI agent misled him about the availability of the acceptance of responsibility sentence reduction. "Incriminating statements obtained by government acts, threats, or promises that permit the defendant's will to be overborne are coerced confessions running afoul of the Fifth Amendment and are inadmissible at trial as evidence of guilt." *Short*, 947 F.2d at 1449. Specifically, a promise of leniency made in exchange for an inculpatory statement is a "product of inducement, and thus not an act of free will." *Griffin v. Strong*, 983 F.2d 1540, 1543 (10th Cir. 1993) (quotation omitted).

The district court determined that the interviewing FBI agent's comments concerning the acceptance of responsibility and implication that the defendant would receive the reduction in exchange for speaking was "a misleading thing for the agent to do." The district court also noted that, despite the agent's error, the defendant refrained from speaking about the assault.

Similarly, this court concludes that Stroud was not subject to coercion because the statements that he challenges were made prior to any reference to the acceptance of responsibility reduction. *See United States v. Glover*, 104 F.3d 1570, 1580 (10th Cir. 1997) (concluding in part that because the government's promise of leniency occurred after the interview, the defendant's will was not

overborne and her confession was voluntary). Although the agent implied that Stroud's sentence could be impacted by explaining what happened to Pittman on the morning of the assault, Stroud neither discussed the assault nor provided any details about the events that unfolded that morning. Thus, there was no exchange of a promise of leniency for Stroud's incriminating statements; he was not induced to speak. Moreover, the jury was instructed that they could disregard any statement that was not knowingly made. Because the statements were voluntary and were not coerced,[1] the district court did not err in denying Stroud's motion to suppress.

B.      Impeachment Testimony

Stroud contends that the district court abused its discretion by permitting the government to inquire into the mental health history of Robinson on cross-examination. This court reviews the district court's determination to permit the impeachment of a witness based upon his mental health history for abuse of discretion. *See United States v. Butt*, 955 F.2d 77, 84 (1st Cir. 1992). "An evidentiary ruling will be overturned on appeal only if the abuse of discretion suggests an arbitrary, capricious, whimsical, or manifestly unreasonable judgment." *United States v. Hinkle*, 37 F.3d 576, 579 (10th Cir. 1994)

---

[1]Because we conclude that Stroud's statements to the FBI were voluntarily made and not coerced, it is not necessary for this court to address whether the statements were exculpatory or inculpatory.

(quotations omitted). Unless Stroud's substantial rights were affected, however, the district court's decision to admit the impeachment evidence was harmless. *United States v. Charley*, 189 F.3d 1251, 1270 (10th Cir. 1999). An error affecting the substantial rights of a defendant is one that has a "substantial influence on the outcome or which leaves one in grave doubt as to whether it had such effect." *Id.* (quotations omitted).

Stroud argues that there was no evidence suggesting Robinson's mental problems affected his ability to perceive or recall events or to testify accurately. He also asserts that questions concerning Robinson's mental condition were not relevant to his credibility. After review of the record, this court concludes that the district court's admission of Robinson's impeachment testimony did not substantially influence the outcome or leave this court in grave doubt that the jury's verdict would have differed had the district court precluded the government from questioning Robinson about his mental health history. Although Robinson was asked about his current and past medications and prior hospitalizations, he also explained on both cross-examination and redirect examination that his mental condition did not affect his ability to perceive events and that a formal evaluation acknowledged that he did not suffer from a diminished capacity. Furthermore, there was other evidence which made the attempted impeachment less likely to have had a substantial influence on the jury verdict, namely that Stroud admitted

to throwing the hot water at Pittman, that no weapon was discovered after the incident took place, and that there was corroborating testimony from the treating physician that Pittman was laying down when the water was thrown on him. Moreover, the jury was instructed that they were "the sole judges of the believability of the witnesses and the weight their testimony deserves" and thus could have disregarded the impeachment testimony. *See United States v. Moore*, 923 F.2d 910, 913 (1st Cir. 1991) (noting that the question of whether mental health interferes with a witness' ability to perceive or recall events or to testify accurately is within the province of the jury); *see also* Fed. R. Evid. 601 advisory committee's note (stating that mental incapacity goes to the weight and credibility of the witness).

In sum, this court need not decide whether the district court abused its discretion in allowing the government to inquire about Robinson's mental health history because any error was harmless.

## IV. CONCLUSION

Based upon the foregoing reasons, this court **AFFIRMS** Stroud's conviction.

ENTERED FOR THE COURT

Michael R. Murphy
Circuit Judge