FILED
United States Court of Appeals
Tenth Circuit

October 20, 2009

Elisabeth A. Shumaker
Clerk of Court

**PUBLISH**

## UNITED STATES COURT OF APPEALS

## TENCH CIRCUIT

UNITED STATES OF AMERICA,

Plaintiff–Appellee,

v.

No. 08-3120

DAVID EARL ROBINSON,

Defendant–Appellant.

**Appeal from the United States District Court
for the District of Kansas
(D.C. No. 5:07-CR-40055-SAC-1)**

Ronald E. Wurtz, Assistant Federal Public Defender (David J. Phillips, Federal
Public Defender, with him on the briefs), Topeka, Kansas, for
Defendant–Appellant.

James A. Brown, Assistant United States Attorney (Marietta Parker, Acting
United States Attorney, with him on the briefs), Topeka, Kansas, for
Plaintiff–Appellee.

Before **LUCERO**, **EBEL**, and **TYMKOVICH**, Circuit Judges.

**LUCERO**, Circuit Judge.

David Earl Robinson was charged with being a felon in possession of a

firearm after selling a gun to a confidential informant ("CI"). Six days before

Robinson's trial, the government's star witness—the CI who purchased the gun from Robinson—was involuntarily committed to a mental health facility. The district court reviewed the CI's medical files in camera but refused defense counsel access to them. It also precluded defense counsel from asking the CI any questions about his mental health history or his use of prescription medications. Robinson was subsequently convicted of violating of 18 U.S.C. §§ 922(g)(1) and 924(a)(2) and sentenced to 33 months' imprisonment.

We must decide if the district court's refusal to provide Robinson access to the CI's medical records contravened due process and whether the court's limitations on cross-examination of the CI violated the Sixth Amendment. We answer both questions in the affirmative.

Because of the restrictions imposed by the district court, the jury saw an incomplete and inaccurate picture of the CI's credibility. From the jury's perspective, the CI had only "a little bit" of a drug problem and was not "regularly" violating his agreement with the ATF by using drugs. By that version of events, the CI had largely reformed himself after becoming an ATF informant. Further, although the CI had trouble remembering various details about the events in question, he testified that the only reason for his memory loss was that two years had elapsed by the time of trial. Nothing in the testimony the jury heard suggested that the CI had a reduced capacity to observe or narrate.

Had defense counsel been permitted to view the medical records and conduct a proper cross-examination, the jury would have seen a different picture. It would have learned that the CI had been a heavy drug user since 2000 and had recently been abusing alcohol, cannibis, opioids, benzodiazepine, Valium, Klonopin, Darvocet, and Hydrocodone. The medical records contain admissions by the CI that he had smoked a half-pound of marijuana in a single day shortly before trial and that he had been smoking up to a pound of marijuana per week. The jury would also have heard that the CI had a "long history of mental illness" starting in 2000, which included auditory hallucinations, seeing "things out through the window that are not really there," and "hearing voices telling him to do thing[s]." If the jury had been aware of this information, it may well have rejected the CI's testimony, without which Robinson could not have been convicted.

Exercising jurisdiction under 28 U.S.C. § 1291, we reverse and remand.

**I**

**A**

After receiving a tip from a CI, agents with the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") came to suspect a man named "PJ" of illegally possessing a pistol. An ATF agent requested that the CI attempt to purchase the gun. When the CI attempted to do so, however, he learned that PJ had already transferred the gun to Robinson, with whom the CI was also

- 3 -

acquainted. Suspecting the handgun to be evidence of illegal activity, the ATF sought to arrange a "controlled buy" from Robinson.

After the CI set up the purchase, he and an ATF agent drove to Robinson's home. Before beginning the encounter, the agent searched the CI for contraband and placed a small audio recording device in his pocket. The CI then approached Robinson's home and an adult male, whom the agent could not identify, opened the door to allow the CI inside. After approximately one minute, the CI returned to the agent's car with a handgun. The agent took the handgun, gave the CI cash, and sent him back inside to pay for the gun. Reentering Robinson's home, the CI dropped off the cash and returned to the agent's car.

Following the purchase, the CI confirmed, using a photographic lineup, that Robinson was the person from whom he purchased the gun. Robinson, a previously convicted felon, was subsequently indicted for possession of a firearm in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2).

**B**

Shortly before Robinson's trial, the government disclosed that the CI had been involuntarily committed to Osawatomie State Hospital by his mother, who thought him to be suicidal. The government reported that the CI would be released in time to testify. Robinson's counsel then filed a motion requesting the district court to issue a subpoena for the CI's mental health records. The district court granted the motion but ordered the CI's records to be transmitted directly to

the court.  In the meantime, the government filed a motion in limine to preclude Robinson's counsel from inquiring into the CI's mental health at trial.

Prior to argument on the motion, at an ex parte, in camera hearing, the court spoke with a psychiatrist at Osawatomie.  The psychiatrist relayed his diagnosis of the CI's mental status and stated that in his opinion the CI would be able to testify truthfully.  Later, at the in limine hearing, the court ruled, "I am going to . . . grant the Government's motion in limine to preclude [cross-examination on the CI's mental condition].  However, I may take it under . . . consideration at a later time because the [CI's medical] records will be presented to the Court."  It also informed the parties that the CI had been diagnosed with "poly-substance abuse, mood disorder with an Axis II, temporary, for anti-social traits."

The next day, the court heard additional arguments regarding the subpoena and the motion in limine.  Voicing concern that the CI's mental health issues could be used in a "scurrilous effort to discredit" the CI, the court reaffirmed its previous ruling, concluding the CI's mental condition was not material.  It suggested that if defense counsel were permitted to question the CI about his recent treatment, the jury could infer that "there may be something seriously wrong with [the CI] . . . .  [a]nd for that reason, they're not going to believe him."

Robinson's counsel objected to the court's ruling, citing United States v. Lidstrom, 698 F.2d 1154 (11th Cir. 1983), which held that a district court

contravened the Confrontation Clause by narrowly limiting cross-examination as to a witness's psychiatric history. See id. at 1159-64. The court took Robinson's cited case law under consideration but did not alter its ruling. Defense counsel also sought a stay pending receipt of the CI's medical records, which the court had not yet obtained, but that request was denied.

## C

The government's first witness at trial was the ATF agent who had arranged the controlled buy. He described the process of recruiting and retaining the CI and recounted the events surrounding the gun purchase. Next, the government introduced an audio recording captured by the device the CI carried in his pocket. It was low-quality, interspersed with static, and revealed few details of the events that took place inside Robinson's home. Despite its limited evidentiary value, the recording does reveal that when the CI entered Robinson's home for the second time to drop off the cash, he called out Robinson's name twice and referred to the handgun's missing serial number.

Lastly, the government called the CI to the stand. He confirmed the ATF agent's account of the controlled buy and testified that Robinson was the man who let him into the house and sold him the gun. On cross-examination, Robinson's counsel attempted to impeach the CI by eliciting testimony on his criminal history, the payments he received from the ATF, and the ATF's intervention on his behalf following "scrape[s]" with the law. The CI stated he

was a close friend of the Robinson family, was able to come and go from Robinson's house as he pleased, and had smoked marijuana with Robinson on the night before the controlled buy. The CI maintained, however, that he had reformed himself after beginning his work with the ATF. He claimed that he had not "regularly" violated his CI agreement and insisted he had only "a little bit" of a drug problem. When he was unable to recall certain details about the controlled buy, the CI testified that the sole reason for his memory loss was the passage of time.

After the prosecution's case-in-chief, the court reported that it had reviewed the CI's medical records in camera and reiterated its ruling that it would not furnish them to Robinson's counsel. Although the court had previously provided the CI's psychiatric diagnosis to the parties, it failed to disclose that the records contained information on the CI's abuse of illegal and prescription drugs. Nor did the court apprise the parties that the records contained detailed evidence regarding the CI's psychiatric condition. Robinson's counsel objected to the court's decision: "[J]ust so the record is very clear, I request, once again, that [the records] be provided to me for review—not for use—but for review with the option of returning [the CI] to the stand and asking him about them." Robinson's objection was overruled.

Robinson argued to the jury that the CI was lying and had planted the gun in Robinson's home the night before the buy. His case-in-chief consisted solely

of testimony from witnesses called to impeach the CI. One witness suggested that the CI had a reputation for dishonesty, and three testified that the CI had been inaccurate in his recollection of the number of children in the Robinson household.

Robinson was convicted and sentenced to 33 months' imprisonment. He timely filed this appeal.

**II**

Robinson first contends that the district court violated the Due Process Clause of the Fifth Amendment by refusing him access to the CI's mental health records. Those records reveal three categories of evidence that Robinson claims were material to his defense: (1) illegal drug use by the CI; (2) the CI's mental health condition; and (3) the CI's use of prescription medications at the time of trial. "This court reviews de novo whether a defendant's due process rights have been violated."[1] United States v. Nickl, 427 F.3d 1286, 1296 (10th Cir. 2005).

---

[1] The government and dissent assert that our review of this issue should be confined to plain error. We disagree. The district court was well aware that Robinson sought access to the CI's records based in part on due process grounds. In his pre-trial motion to subpoena the CI's records, Robinson invoked United States v. Nixon, 418 U.S. 683 (1974), in which the Court explained that "the Fifth Amendment . . . guarantees that no person shall be deprived of liberty without due process of law. It is the manifest duty of the courts to vindicate those guarantees, and to accomplish that it is essential that all relevant and admissible evidence be produced." Id. at 711; see also id. at 712 ("[T]he allowance of the privilege to withhold evidence that is demonstrably relevant in a criminal trial would cut deeply into the guarantee of due process of law and gravely impair the basic function of the courts."). Further, in his post-trial "Motion to Permit Inspection

(continued...)

- 8 -

The Due Process Clause of the Fifth Amendment provides that "[n]o person shall . . . be deprived of life, liberty, or property, without due process of law." U.S. Const. amend. V. In criminal prosecutions, the clause's primary guarantee is the right to a fundamentally fair trial. See United States v. Bagley, 473 U.S. 667, 675-76 (1985); see also Pennsylvania v. Ritchie, 480 U.S. 39, 56 (1987); Brady v. Maryland, 373 U.S. 83, 87 (1963). Pennsylvania v. Ritchie holds that due process entitles a criminal defendant to have a witness's potentially privileged records reviewed in camera to determine whether they contain material evidence when the asserted privilege is not absolute but contains exceptions that might allow for

---

[1](...continued)
of Sealed Medical Documents," Robinson expressly argued that denying "access to the documents is to deny the defendant . . . his right to Due Process of Law guaranteed by the Fifth Amendment." Perhaps most importantly, in denying Robinson's motions for a new trial and inspection of the records, the district court acknowledged that Robinson had advanced a due process challenge, characterizing his argument as: "[T]he court's refusal to permit . . . inspection violates defendant's . . . Fifth Amendment right to due process."

The waiver doctrine is intended in part to prevent a party from "sandbagging"—holding back arguments in hope of finding a more sympathetic audience on appeal. See Wainwright v. Sykes, 433 U.S. 72, 89 (1977). When the district court understands a party to have raised a particular argument, that goal is met. See United States v. Pena, 216 F.3d 1204, 1209 (10th Cir. 2000) (relying on the district court's understanding of an argument to determine waiver issue); United States v. Mejia-Alarcon, 995 F.2d 982, 985 n.1 (10th Cir. 1993) (same).

Admittedly, Robinson's post-trial arguments centered on the Confrontation Clause, but that is hardly surprising. After all, "[a]ccess to the records is . . . not [defense] counsel's ultimate goal; it is an attempt to discover information that can be used to cross-examine the witness at trial, or to provide a basis to call the therapist or counselor as a witness and question him or her about the witness's condition and treatment." Clifford S. Fishman, Defense Access to a Prosecution Witness's Psychotherapy or Counseling Records, 86 Or. L. Rev. 1, 3 n.1 (2007).

disclosure of material evidence. 480 U.S. at 57-58. Any such material non-privileged information must be disclosed to the defense. Id. at 60.

The district court concluded that the CI's records did not contain information material to Robinson's defense. We cannot agree. "[E]vidence is material . . . if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." Ritchie, 480 U.S. at 57 (quotation and alteration omitted).[2] A defendant need not show that the withheld records would have "resulted ultimately in [his] acquittal." Kyles v. Whitley, 514 U.S. 419, 434 (1995). Rather, "the touchstone is simply whether the ultimate verdict is one 'worthy of confidence.'" United States v. Ford, 550 F.3d 975, 993 (10th Cir. 2008) (Gorsuch, J., dissenting) (quoting Strickler v. Greene, 527 U.S. 263, 290 (1999)). This materiality test applies with equal force to both exculpatory and impeachment evidence. Bagley, 473 U.S. at 676.

We conclude there exists "a reasonable probability that . . . the result of the proceeding would have been different" had Robinson been privy to the contents of the CI's mental health records and been allowed to cross-examine the CI on that basis. Ritchie, 480 U.S. at 57 (quotation omitted); see United States v.

---

[2] Ritchie's materiality test was taken from the Court's line of decisions beginning with Brady, 373 U.S. at 87. Ritchie, 480 U.S. at 57.

Torres, 569 F.3d 1277, 1282-84 (10th Cir. 2009) (concluding that evidence was material and reversing conviction when government failed to disclose that the CI, on whose testimony the conviction depended, had been retained by the government as an informant on two prior occasions); Part III.A, infra. In weighing the materiality of the medical records, we note that the CI was the only witness who testified directly to Robinson's possession; his testimony was central—indeed essential—to the government's case. He arranged the purchase of the firearm and negotiated the purchase price. He is the only person who interacted with Robinson and the only one who identified Robinson. It is not a stretch to say that the guilty verdict in this case depended upon the CI's testimony. See Torres, 569 F.3d at 1282-84; cf. Kyles, 514 U.S. at 441-45, 453-54 (concluding that evidence was material and reversing for new trial when suppressed evidence could have undermined the credibility of prosecution's key witnesses).

Little evidence corroborates the key aspects of the CI's story. While the audio recording confirms the interaction between the CI and the ATF agent, it sheds virtually no light on what occurred during the few moments the CI was inside Robinson's house. But those few moments are the government's entire case. Moreover, the "controlled" buy was controlled in name only. It took place entirely outside the view of the ATF agent, and, as the government admits, its audio recording of the event "turned out to be of little evidentiary value."

- 11 -

(Appellee Br. at 27 n.1.)  By claiming that the crucial aspects of the CI's story were corroborated, the government "seriously underestimates the extent to which the government's case rested on the credibility of the CI.  The CI's trial testimony was critical to [its] ability to link [Robinson] to the controlled buy."  Torres, 569 F.3d at 1282.

Because the CI was the only witness who testified about Robinson's possession and because his testimony was essentially uncorroborated, the CI's credibility was of paramount concern.  See United States v. Payne, 63 F.3d 1200, 1210 (2d Cir. 1995) ("In general, impeachment evidence has been found to be material where the witness at issue supplied the only evidence linking the defendant(s) to the crime." (quotation omitted)).  Given the importance of the CI's credibility, we cannot affirm the district court's conclusion that the medical records did not contain material information.  See Torres, 569 F.3d at 1282-83.

These medical records reveal evidence of illegal drug use by the CI that is far more extensive than the jury was led to believe.  At trial, the CI testified that he had cleaned up his act after beginning work with the ATF and that he was not "regularly" using drugs.  The medical records belie this testimony.  On his admission to the mental health facility (less than one week before trial), the CI admitted to using drugs since 2000, including current use of "opio[i]d[s], alcohol, cannibis, and benzodiazepine."  He claimed to have smoked a half-pound of marijuana a few days prior to admission and told his doctors that he and a friend

had been smoking up to a pound of marijuana per week and using street-bought opioids and "benzos." He reported abusing prescription medications, including Valium, Klonopin, Darvocet, and Hydrocodone.

Evidence of this extensive illegal drug use would have been used to impeach the CI's credibility in several ways. It directly contradicts his testimony that he had only "a little bit" of a drug problem and that he was not "regularly" using illegal drugs. Showing that the government's star witness lied on the stand could well have impacted the jury. Further, the CI's agreement with the ATF prohibited him from engaging in criminal activity (including illegal drug use). The jury could have inferred that if the CI were willing to repeatedly breach the terms of his informant agreement, he might also be willing to testify falsely.

Illegal drug use does not merely bear on the CI's veracity but also on his capacity as a witness. "A witness's credibility may always be attacked by showing that his or her capacity to observe, remember, or narrate is impaired. Consequently, the witness's capacity at the time of the event, as well as at the time of trial, is significant." 4 Jack B. Weinstein & Margaret A. Berger, Weinstein's Federal Evidence, § 607.05[1] (Joseph M. McLaughlin ed., 2d ed. 2009). Extensive drug use since 2000 suggests that the CI could have been under the influence at the time of the alleged firearm sale. Moreover, "[i]f the witness was under the influence of drugs or alcohol at the time he testifies, this condition is provable, on cross or by extrinsic evidence, to impeach." Kenneth S. Broun,

McCormick on Evidence § 44 (6th ed. 2006) (alterations omitted). Had Robinson known that the CI had much more than "a little bit" of a drug problem, he certainly would have explored whether the CI was using drugs at the time of the alleged sale or at the time of trial. Cf. United States v. Crosby, 462 F.2d 1201, 1203 (D.C. Cir. 1972) (district court abused its discretion in denying defense request to subpoena key witness's medical records when witness was long time drug addict who had used drugs on day of trial).

In addition to the drug use evidence, the CI's capacity to testify could have been further undermined by evidence of his mental condition. His medical records reveal that at the time of hospital admission (six days before trial), the CI was suffering from auditory hallucinations, seeing "things out through the window that are not really there," and possibly experiencing psychosis. On their face, these diagnoses bear on the CI's "ability to perceive or to recall events or to testify accurately." United States v. Butt, 995 F.2d 77, 82 (1st Cir. 1992) (quotation omitted). Robinson's attempt to access these records was anything but a "scurrilous effort to discredit" the CI; it was aimed at uncovering legitimate doubts as to the CI's capacity as a witness.

These records also show that the CI was prescribed a variety of medications upon discharge from the hospital—medications the CI was using at the time of trial. As even the dissent concedes, the CI's use of prescription drugs is relevant evidence given its potential to color his testimony, particularly in light of CI's

- 14 -

insistence that only the passage of time explained his memory lapses.[3]  Cf. United

States v. Jones, 213 F.3d 1253, 1261 (10th Cir. 2000) (suggesting prescription

medications might affect a witness's "memory, perception, or comprehension");

United States v. Clemons, 32 F.3d 1504, 1511 (11th Cir. 1994) ("[A] witness's

use of drugs may not be used to attack his general credibility, but only his ability

to perceive the underlying events and to testify lucidly at trial.").[4]

We are not persuaded by the government and dissent's reasoning that

disclosing the medical records would not have bolstered Robinson's theory of the

case.  This argument implies that impeachment evidence is material only if it

undermines the credibility of a witness in a manner consistent with the

defendant's position at trial.[5]  But here impeachment of the CI would not have

---

[3] The district court could have allowed defense counsel to explore these issues outside the presence of the jury and to argue their relevance before definitively ruling on their admissibility.  See United States v. Mojica, 185 F.3d 780, 788-89 (7th Cir. 1999); cf. Fed. R. Evid. 104(a).

[4] The dissent states that some of the records were privileged and thus inadmissible.  Although some of the records may be subject to a claim of privilege, we see no assertion of privilege in the record by the CI or the prosecution (assuming the government could even claim the privilege on behalf of the CI).  The district court did not rule on the matter, and it is not argued in the parties' briefs to this court.  We also note that any privilege from disclosure has already been eviscerated because Robinson's counsel apparently reviewed the records in crafting his appellate brief.  Whether particular documents would be nonetheless inadmissible is a matter we leave for the district court to decide in the first instance.

[5] Of course, Robinson is not obligated to present any evidence at all; the government bears the burden of establishing guilt beyond a reasonable doubt.  In

(continued...)

- 15 -

been inconsistent with Robinson's theory of defense. Indeed, Robinson's counsel tried, ineffectively without the withheld information, to impeach the CI.

Disclosing the records may well have bolstered Robinson's theory. Robinson argued that the CI planted the gun in his house the night before the controlled buy (the CI admitted that he was at Robinson's house smoking marijuana that night). If the jury knew that the CI had lied about his drug use on the stand, it might have found this theory more plausible. The extreme nature of the CI's drug use also provides a motive for the CI to frame Robinson: continued funding through his ATF informant agreement to support his drug habit.

Moreover, we cannot know whether Robinson's theory would have been different had he been permitted to review the material evidence in the CI's medical files, nor can we determine how the jury would have reacted to such hypothetical arguments. Cf. United States v. Montelongo, 420 F.3d 1169, 1176 (10th Cir. 2005) ("[W]e cannot say for certain how much information the Defendants might have elicited from [the witness] on cross-examination, how the jury might have viewed [the witness's] demeanor on cross-examination, or how persuasive the evidence . . . would have been to the jury."). In light of the substantial evidence calling into question the CI's perception and retention

[5](...continued)
re Winship, 397 U.S. 358, 364 (1970).

- 16 -

abilities, Robinson might have argued that the CI did not remember the events at issue but was merely parroting the ATF's version of events.[6]

The evidence contained in the records was not cumulative. Because Robinson was denied access to the records, he was not permitted to argue that the CI's drug use, mental health problems, and use of prescription drugs at the time of trial affected his testimony. United States v. Wilson, 481 F.3d 475, 480 (7th Cir. 2007) ("[E]vidence that provides a new basis for impeachment is not cumulative and could well be material."). None of these avenues of impeachment is duplicative of those Robinson was able and allowed to pursue at trial. See Torres, 569 F.3d at 1284 ("Merely because other impeachment evidence was presented does not mean that additional impeachment evidence is cumulative . . . .").

In sum, viewed against the backdrop of CI's centrality to the government's case, the withheld evidence of the CI's extensive drug abuse, his mental health issues, and his use of prescription drugs at the time of trial (whether considered individually or cumulatively) lead us to conclude that the verdict is not "worthy of confidence."[7] Kyles, 514 U.S. at 434.

---

[6] The CI admitted that he reviewed police reports of the incident prior to testifying.

[7] Having concluded that the district court denied Robinson due process by refusing to provide access to the material portions of the CI's mental health records, a further harmless-error analysis is unnecessary. See Kyles, 514 U.S. at

(continued...)

**III**

We next consider whether the district court violated the Confrontation Clause when it forbade Robinson from cross-examining the CI on his mental health history and his use of prescription medications.[8]  "We review de novo whether a defendant's Sixth Amendment confrontation rights were violated by cross-examination restrictions . . . ." United States v. Byrne, 171 F.3d 1231, 1234 (10th Cir. 1999) (quotation omitted).  We conclude that both cross-examination limitations violated the Confrontation Clause and that the government has not met its extraordinary burden of proving that these constitutional errors were harmless beyond a reasonable doubt.  See Delaware v. Van Arsdall, 475 U.S. 673, 684 (1986).

**A**

The Sixth Amendment guarantees the right of a defendant to "be confronted with the witnesses against him."  U.S. Const. amend. VI.  "[A] primary interest secured by [the Confrontation Clause] is the right of cross-examination."  Davis, 415 U.S. at 315 (quotation omitted).  Although a district court may exercise its discretion through reasonable limits on the scope of questioning, "[c]ross-examination is the principal means by which the believability of a witness and the

---

[7](...continued)
435-36.

[8] Because questions regarding the scope of cross-examination are likely to arise on remand, we think it best for us to decide this issue.

truth of his testimony are tested." Id. at 316. A court may violate the

Confrontation Clause when it inappropriately "preludes an entire relevant area of

cross-examination." Montelongo, 420 F.3d at 1175 (quotation omitted). As the

Fifth Circuit has explained, "Where the witness the accused seeks to

cross-examine is the 'star' government witness, providing an essential link in the

prosecution's case, the importance of full cross-examination to disclose possible

bias is necessarily increased." Greene v. Wainwright, 634 F.2d 272, 275 (5th Cir.

1981) (quotation omitted). Robinson was prohibited from questioning the

prosecution's star witness on two highly relevant topics: the CI's mental health

and his prescription medication use. We hold that both limitations constitute

reversible error.[9]

Evidence that the CI has suffered from auditory hallucinations and saw

"things out through the window that are not really there" was relevant because it

would have "provide[d] some significant help to the jury in its efforts to evaluate

the [CI's] ability to perceive or to recall events or to testify accurately." See

United States v. Moore, 923 F.2d 910, 913 (1st Cir. 1991); see also Fed. R. Evid.

401. So, too, was evidence of his use of prescription drugs at the time of trial.

_____

[9] Because the district court did not limit Robinson's ability to cross-examine the CI regarding illegal drug use, it did not violate the Sixth Amendment in that respect. However, for the reasons discussed above, the court denied Robinson due process by refusing to disclose the CI's mental health records. See Part II, supra. Had Robinson been given access to those records, no doubt his cross-examination of the CI as to illegal drug use would have been different.

Cf. Jones, 213 F.3d at 1261; Clemons, 32 F.3d at 1511. Moreover, the probative value was not substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury. See Fed. R. Evid. 403.

This is not a case in which a party attempts to unfairly malign a witness for distant and relatively minor mental health issues. See Moore, 923 F.2d at 912-13 (not an abuse of discretion to refuse to permit inquiry into a witness's consultation with a therapist ten years prior related to a child's death). Instead, the present case parallels Greene v. Wainwright, in which the Fifth Circuit granted habeas relief after a trial court prohibited all inquiry into the mental health history of the prosecution's key witness. 634 F.2d at 275-76. In Greene, the government's case turned on a single witness's testimony that Greene sold him marijuana. Our sibling circuit reasoned that "[i]t is just as reasonable that a jury be informed of a witness's mental incapacity at a time about which he proposes to testify as it would be for the jury to know that he then suffered an impairment of sight or hearing." Id. at 276.

In this case, the mental health testimony sought by Robinson concerns events that took place just days before trial began, unlike the situation in United States v. Moore, in which the relevant events occurred ten years before trial. See Moore, 923 F.2d at 913. The CI's mental health issues also relate directly to his capacity to observe and remember. Cf. id. at 912-13 (visit to a therapist for death of a child not related to witness's capacity). As in Greene and unlike in Moore,

the CI's material testimony was wholly uncorroborated. Compare Moore, 923 F.2d at 913, with Greene, 634 F.2d at 275. Also as in Greene, the district court's cross-examination prohibition here was categorical. See Greene, 634 F.2d at 275. Under these circumstances, the district court erred under Rule 403 by imposing a blanket proscription of cross-examination related to the CI's mental health condition and his use of prescription medications.

**B**

The district court's refusal to permit any inquiry into the CI's mental health history and use of prescription medications violated the Sixth Amendment. As we explained in United States v. Montelongo, "a constitutional violation occurs when the defendant is prohibited from engaging in otherwise appropriate cross-examination that, as a result, precludes him from eliciting information from which jurors could draw vital inferences in his favor." 420 F.3d at 1175 (quotation omitted).

Although violations of the Confrontation Clause are subject to harmless error analysis, Van Arsdall, 475 U.S. at 684, these errors were not harmless beyond a reasonable doubt. Id. As discussed in Part II, supra, the CI's credibility provides the lynchpin of the government's case: He is the only witness who identified Robinson and his testimony is the only useful evidence linking Robinson to possession of the gun. The jury's view of his credibility was therefore crucial. See Payne, 63 F.3d at 1210.

Cross-examination into the CI's mental health history may have undermined the CI's credibility as a witness. As noted above, credibility concerns not only veracity, but the witness's capacity to "observe, remember, or narrate" both at the time of the trial and at the time of the event. 4 Jack B. Weinstein & Margaret A. Berger, Weinstein's Federal Evidence, § 607.05[1] (Joseph M. McLaughlin ed., 2d ed. 2009). Had the jury learned that the CI had recently admitted to "hearing voices," "seeing things out the window that [were] not really there," and experiencing suicidal ideation, it could have reasonably concluded that the CI had a reduced capacity to observe, remember, and recount. Absent the district court's restrictions on cross-examining the CI about his hospitalization, Robinson would have likely revealed these problems with perception and narration, along with the CI's "long history of mental illness." Because these problems deeply compromise the CI's credibility and because the CI was the fulcrum of the government's case, we cannot conclude beyond a reasonable doubt that the jury would have reached the same verdict had Robinson been allowed to cross-examine the CI about his recent hospitalization. See Van Arsdall, 465 U.S. at 684.

For similar reasons, the district court's refusal to allow cross-examination of the CI regarding his use of prescription medication cannot be deemed harmless. When the CI was discharged from the mental hospital just before trial, he was instructed to continue to take three medications: 20 mg of citalopram once a day,

500 mg of dicloxacillin four times a day, and 1 mg of risperidone twice a day.[10] Robinson should have been permitted to inquire as to whether these medications affected the CI's memory, perception, or ability to narrate the events at issue. Assuming "that the damaging potential of th[is] cross-examination were fully realized," Van Arsdall, 475 U.S. at 684, the jury may have been much more inclined to disregard the CI's testimony.

We have already concluded there exists a "reasonable probability" the jury would have reached a different decision had Robinson been privy to the CI's prescription drug usage; it necessarily follows that the district court's prohibition on cross-examination regarding the same topic cannot clear the high hurdle of harmlessness beyond a reasonable doubt. See Kyles, 514 U.S. at 435-36; Van Arsdall, 475 U.S. at 684.

## IV

For the reasons stated, we **REVERSE** Robinson's conviction and **REMAND** for further proceedings consistent with this opinion.[11]

---

[10]There is little in the record about the exact nature or potential side effects of these medications. However, there will nearly always be a lack of evidence on the record about the a particular issue when a defendant's rights under the Confrontation Clause have been violated by forbidding cross-examination on that issue. In assessing the harm of the Confrontation Clause violation, we must therefore assume "that the damaging potential of th[is] cross-examination were fully realized," Van Arsdall, 475 U.S. at 684.

[11] Because we reverse Robinson's conviction, we need not decide his challenge to being shackled during sentencing or his appeal of his sentence.

No. 08-3120, *United States v. Robinson*

**TYMKOVICH**, J., dissenting.

I respectfully dissent.  Unlike the majority, I would hold that because Robinson did not adequately raise his Due Process Clause claim before the district court, it is subject to plain error review on appeal and fails that standard. I also disagree with the majority that the district court violated the Confrontation Clause when it precluded an inquiry into the confidential informant's (CI) mental health.  Such an inquiry would have been more prejudicial than probative under Federal Rule of Evidence 403.  Finally, although I agree with the majority that the district court erred in limiting Robinson's cross-examination of the CI regarding the prescription medications the CI was taking, I conclude—based upon my review of the record—that the error was harmless and does not require reversal.

## I.  Due Process Claim

Robinson's first argument on appeal is that the district court denied him due process under *Pennsylvania v. Ritchie*, 480 U.S. 39 (1987), when the court reviewed the CI's psychiatric records in camera before trial and denied Robinson access to those records.  The government contends Robinson failed to raise this claim below, subjecting it to plain error review on appeal.  The government further asserts that the claim fails to satisfy the plain error standard.  I agree.

Robinson did not adequately apprise the district court of his due process claim, making only general arguments that lacked the requisite specificity.  And because the district court's decision to maintain the confidentiality of the CI's

psychiatric records was not contrary to the well-settled law of *Ritchie*, Robinson's

due process claim falls short under plain error review.

## A. Failure to Preserve the Due Process Claim

Under our jurisprudence, issues not properly raised in the trial

court—including those that implicate a defendant's rights under the

Constitution—are reviewed under the deferential plain error standard. *See United*

*States v. Redcorn*, 528 F.3d 727, 744 (10th Cir. 2008) (reviewing a *Brady* due

process claim for plain error). In order to properly raise an issue in the trial court

and ensure the fullest possible review on appeal, a defendant must object with

specificity, drawing the trial court's attention to the precise claim advanced. The

district court should not be required to guess at the defendant's potential

arguments: "Our precedent is clear that an objection must be 'definite' enough to

indicate to the district court 'the precise ground' for a party's complaint. . . .

Absent a specific objection, the district court is deprived of the opportunity to

correct its action in the first instance." *United States v. Winder*, 557 F.3d 1129,

1136 (10th Cir. 2009) (internal citations omitted) (quoting *Neu v. Grant*, 548 F.2d

281, 287 (10th Cir. 1977)), *cert. denied*, 129 S. Ct. 2881 (2009); *see also United*

*States v. Garcia*, 994 F.2d 1499, 1505 (10th Cir. 1993) ("Defendant did not raise

a specific objection based on the confrontation clause at trial. Thus, we review

for plain error.").

In his reply brief, Robinson concedes that "the issue [of disclosure of the CI's psychiatric records] may not have been squarely raised [in the trial court] under the rubric of Due Process." Aplt. Reply Br. at 2. Despite this admission, the majority asserts that Robinson did, indeed, squarely raise the due process issue in his pre-trial motion to subpoena the CI's medical records and in his post-trial motion to inspect the records. My review of these motions convinces me otherwise.

Nowhere in the pre-trial motion does Robinson mention the phrase "due process." The majority suggests Robinson's citation of *United States v. Nixon*, 418 U.S. 683 (1974), should have put the district court on notice that due process concerns were at play. But Robinson cited *Nixon* only for the general standards governing the issuance of subpoenas under Federal Rule of Criminal Procedure 17: relevancy, admissibility, and specificity. *See id*. at 699–700. And although *Nixon* tangentially discusses due process in the context of analyzing whether the President of the United States may assert a privilege and thereby quash a subpoena, *see id*. at 711–12, this does not mean the district court was apprised of Robinson's due process claim. Merely citing a case, which may stand for many propositions of law, cannot amount to properly raising an objection with the requisite specificity to avoid plain error review on appeal. *See Winder*, 557 F.3d at 1136.

As for the post-trial motion for inspection, there again Robinson failed to specifically apprise the district court of his due process claim. He argued that the "denial of access to the records prevents counsel for Mr. Robinson from adequately arguing for a new trial." R. Vol. 1, Doc. 72 at 1. He also asserted, without explanation, that "[t]o deny access to the documents is to deny the defendant his Sixth Amendment right to the effective assistance of counsel, and his right to Due Process of Law." *Id.* at 2. These "blanket objections" are precisely the kind that lack the "specificity required to preserve the precise issue . . . on appeal." *Winder*, 557 F.3d at 1136 (quoting *United States v. Bedford*, 536 F.3d 1148, 1153 n.4 (10th Cir. 2008), *cert. denied*, 129 S. Ct. 1359 (2009)). Due process is an expansive topic, and nothing in Robinson's cursory statements suggest he was arguing for the type of relief contemplated by *Ritchie*. Furthermore, in Robinson's motion for a new trial, he confined his arguments to the Confrontation Clause. This shows that Robinson's general and cursory arguments in the post-trial motion for inspection—which, if granted, would purportedly have permitted him only to "adequately argu[e] for a new trial," R. Vol. 1, Doc. 72 at 1—were meant to inform the more specific Confrontation Clause arguments in the motion for new trial. Thus, the post-trial motion for inspection did not specifically apprise the district court of Robinson's particular due process claim.

For his part, Robinson does not suggest his pre- and post-trial motions properly raised his due process claim. Instead, he argues that two cases he submitted to the district court prior to trial, *United States v. Lindstrom*, 698 F.2d 1154 (11th Cir. 1983), and *Chnapkova v. Koh*, 985 F.2d 79 (2d Cir. 1993), "placed the [district court] on notice" of his due process claim. Aplt. Reply Br. at 2. These cases, however, are off the mark. *Lindstrom* was decided under the Confrontation Clause and *Chnapkova* under the relevancy standards of Federal Rule of Evidence 403. Neither case squarely presents due process arguments or even suggests due process rights would be infringed if the court refused to provide Robinson access to the CI's psychiatric records.

In sum, the record shows that Robinson's specific objections to the district court were based only on the Confrontation Clause. I would therefore review his due process claim for plain error. *See United States v. Simpson*, 152 F.3d 1241, 1250 (10th Cir. 1998) (reviewing for plain error objections raised on different grounds in the district court); *see also Redcorn*, 528 F.3d at 744.

## B. The Merits of the Due Process Claim

To support his due process claim, Robinson relies primarily on the standards set forth in *Ritchie*. In that case, a state trial court refused a defendant's request to order a child services agency to disclose privileged records pertaining to the victim of sexual abuse. The state law privilege applicable to the

- 5 -

records was qualified, and a "court of competent jurisdiction" could order disclosure. *Ritchie*, 480 U.S. at 44 (internal quotation marks omitted).

Employing a due process analysis, the Supreme Court held that the state court should have conducted an in camera review of the records, and should have released "material" evidence to defense counsel. *Id.* at 58. But the Court also held that the defendant had no due process right to personally examine the records, noting that "[a]lthough the eye of an advocate may be helpful to a defendant . . . this Court has never held . . . that a defendant alone may make the determination as to the materiality of [exculpatory evidence]." *Id*. at 59 (citations omitted).[1]

Here, in light of *Ritchie*, the district court did not commit plain error when it denied Robinson access to the CI's psychiatric records. "Under plain-error review, an error is 'plain' if it is 'obvious or clear, i.e., if it is contrary to well-settled law.'" *United States v. Smith*, 413 F.3d 1253, 1274 (10th Cir. 2005) (quoting *United States v. Edgar*, 348 F.3d 867, 871 (10th Cir. 2003)). Any error by the district court in this case was not "contrary to well-settled law."

---

[1] Our decisions reaffirm *Ritchie*'s holding that criminal defendants have no constitutional right to personally inspect privileged records containing potentially exculpatory evidence. *See United States v. LaVallee*, 439 F.3d 670, 692 (10th Cir. 2006) (refusing to permit a criminal defendant to discover the privileged medical records of an adverse witness); *Tapia v. Tansy*, 926 F.2d 1554, 1559–60 (10th Cir. 1991) (holding that a state trial court did not violate a defendant's constitutional rights when it reviewed an affidavit in camera, sealed the affidavit, and denied the defendant access to the affidavit).

It is important to recognize that the bulk of the CI's medical records—i.e., the portions containing the CI's statements to his psychiatrists and their statements regarding his treatment—were potentially subject to federal privilege. *See Jaffee v. Redmond*, 518 U.S. 1, 15 (1996) ("[W]e hold that confidential communications between a licensed psychotherapist and her patients in the course of diagnosis or treatment are protected from compelled disclosure . . . ."). In this circuit, the privilege has few exceptions, and none were plainly applicable to the facts of this case. *See United States v. Glass*, 133 F.3d 1356, 1360 (10th Cir. 1998) (applying the *Jaffee* rule in a criminal case, and creating a narrow exception to the rule where "disclosure [is] the only means of averting [imminent] harm"); *cf. United States v. Chase*, 340 F.3d 978, 992 (9th Cir. 2003) (refusing to recognize a dangerous-patient exception to the *Jaffee* rule). Indeed, we have noted that the federal psychotherapist privilege "is not rooted in any constitutional right of privacy but in a public good which *overrides* the quest for relevant evidence; the privilege is *not subject to a balancing component*." *Glass*, 133 F.3d at 1358 (emphasis added) (internal quotation marks omitted).

Given these circumstances, the district court exercised caution and judgment despite the thorny legal issues that emerged on the eve of trial. And even though Robinson failed to properly raise his *Ritchie* claim, the court carefully followed the procedure approved in *Ritchie* by conducting an in camera review of the CI's psychiatric records, informing the parties of the CI's

- 7 -

psychiatric diagnosis, hearing arguments from the parties (on several occasions), and determining that the records should remain confidential. *See United States v. Haworth*, 168 F.R.D. 660 (D.N.M. 1996) (conducting an analysis under *Ritchie* and determining that a witness's privileged psychotherapist records should not be disclosed to defendants).

Moreover, the court's decision comports with the *Ritchie* materiality requirement. Under *Ritchie*, only material evidence—i.e., that which "probably would have changed the outcome of . . . trial"—need be disclosed to the defense. 480 U.S. at 58. After reviewing the records in camera, interviewing a doctor from Osawatomie State hospital, and hearing arguments from the parties, the district court determined the CI's psychiatric records contained only irrelevant, prejudicial, or otherwise inadmissible evidence. As explained below in the context of my Confrontation Clause harmlessness analysis, the district court's ruling was sound; disclosure of the records would have had little effect on the outcome of Robinson's trial.

In short, the district court's refusal to permit Robinson to inspect the CI's psychiatric records was not plain error and cannot be the basis for reversal.

## II. Confrontation Clause Claim

Although I would hold that the district court did not run afoul of the Due Process Clause in maintaining the confidentiality of the CI's psychiatric records, I agree with the majority that the district court erred when it prohibited Robinson

from inquiring into the CI's prescription medications at trial. In doing so, the court improperly "preclude[d] an entire relevant area of cross-examination" and therefore infringed Robinson's Confrontation Clause rights. *United States v. Montelongo*, 420 F.3d 1169, 1175 (10th Cir. 2005) (quoting *Parker v. Scott*, 394 F.3d 1302, 1316 (10th Cir. 2005)). I do not, however, agree that the district court erred in prohibiting Robinson from questioning the CI regarding his mental health. That ruling was based on an analysis under Federal Rule of Evidence 403 and was not an abuse of discretion. Moreover, I would hold that any error committed by the district court in limiting cross-examination on the CI's prescription medications was harmless.

## A.    Mental Health

In denying Robinson the opportunity to question the CI regarding his mental health, the court reasoned that any inquiry into the defendant's mental state was irrelevant, would have introduced collateral issues at trial, and would have been more prejudicial than probative under Federal Rule of Evidence 403. Indeed, the court characterized Robinson's efforts to use this evidence against the CI as a mere "scurrilous effort to discredit" the CI. R. Vol. 2, Doc. 93 at 10.

Though the CI's psychiatric problems might have provided Robinson ammunition to damage the CI's credibility before the jury, the court's decision to exclude questions regarding the CI's mental state does not automatically establish a Confrontation Clause violation. Even when a defendant's Confrontation Clause

rights are implicated, "the presentation of evidence . . . 'must comply with established rules of evidence and procedure.'" *United States v. Turner*, 553 F.3d 1337, 1349 (10th Cir. 2009) (quoting *United States v. Solomon*, 399 F.3d 1231, 1239 (10th Cir. 2005)), *cert. denied*, 129 S. Ct. 2446 (2009). I discern no error in the district court's reliance on Rule 403 to exclude cross-examination with respect to the CI's mental health, particularly in light of the court's in camera review of the medical records and examination of the psychiatrist. *Cf. United States v. Hinkle*, 37 F.3d 576, 579 (10th Cir. 1994).

Like the district court in *Hinkle*, the trial court below "saw nothing in [the CI's medical] file or in the testimony given by the psychiatrist *in camera* that suggested that the witness' credibility or perceptive capabilities were impaired." *Id*.; *see also United States v. Gonzales-Sanchez*, 825 F.2d 572, 586 (1st Cir. 1987) ("The trial court found that [the witness] suffered no mental incapacity that would affect his ability to testify . . . ."). Additionally, here, the district court was concerned the jury might improperly discount the CI's testimony merely because of his recent mental health problems. This is a valid consideration under Rule 403. *See United States v. Sasso*, 59 F.3d 341, 348 (2d Cir. 1995); *cf. Hinkle*, 37 F.3d at 579 n.3 (noting that the district court believed the defendant was merely "attempt[ing] to stigmatize the witness before the jury as a psychiatric patient"); *United States v. Butt*, 955 F.2d 77, 83–84 (9th Cir. 1992) (noting that a witness's psychiatric history is "potentially stigmatizing" and therefore may be excluded

from evidence).  Robinson's counsel was informed of the CI's psychiatric diagnosis and was given the opportunity to argue to the district court why cross-examination on the mental health issue was relevant and not overly prejudicial under Rule 403.  Given its careful treatment of the issue, I cannot say the district court abused its discretion.  *See United States v. McCarty*, 82 F.3d 943, 950 (10th Cir. 1996).

In these circumstances, I would hold that the district court's decision to foreclose cross-examination on the CI's mental health did not exceed the "wide latitude" trial courts are afforded in the context of Confrontation Clause challenges.  *Turner*, 553 F.3d at 1349 (quoting *Delaware v. Van Arsdall*, 475 U.S. 673, 679 (1986)).

## B.    Prescription Medications

But the district court did not confine its cross-examination ruling to questions about the CI's mental health.  Robinson was also prohibited from inquiring into the CI's prescription medications or even demonstrating why such cross-examination would have been appropriate.  Though the district court did not explicitly state that any inquiry into the CI's psychiatric medications was off limits, defense counsel was understandably hesitant to delve into the issue.[2]

---

[2]  On the other hand, defense counsel did not ask the court whether its ruling indeed barred any reference to medications the CI was taking at the time of trial.

As the majority points out, a witness's use of drugs or medications is relevant to credibility. *See United States v. Jones*, 213 F.3d 1253, 1261 (10th Cir. 2000) (suggesting prescription medications might affect a witness's "memory, perception, or comprehension"). Thus, I agree with the majority that the district court's apparent prohibition on cross-examination regarding the CI's use of psychiatric medications improperly "preclude[d] an entire relevant area of cross-examination," denying Robinson an opportunity to impeach the CI's memory and perceptive faculties at the time of trial. *Montelongo*, 420 F.3d at 1175 (quoting *Parker*, 394 F.3d at 1316).

The issue could have been avoided had the district court allowed Robinson to conduct a voir dire of the CI or, at minimum, allowed the parties to present arguments outside the presence of the jury regarding any medications the CI was taking at the time of trial. Robinson could then have attempted to demonstrate why the medications were relevant to the CI's credibility. The prosecutor likely would have responded that the evidence was irrelevant or would have prejudiced the jury against the CI. The court then could have made an informed ruling on the record regarding the admissibility of the evidence as it did with respect to the CI's mental health. But there is no such ruling on the record before us.

Thus, this case stands in contrast to other cases involving court-imposed limitations on cross-examination with respect to a witness's mental health and psychiatric medications. On several prior occasions, we have upheld various

- 12 -

restrictions on cross-examination, but usually some inquiry into the witness's mental state was allowed. *See United States v. LaVallee*, 439 F.3d 670, 692 (10th Cir. 2006) (concluding that although the district court denied discovery of a witness's privileged medical records, the court "did not appear to limit the scope of questions that the defendants could ask [the witness] on cross-examination" and therefore did not infringe the defendants' Confrontation Clause rights); *Jones*, 213 F.3d at 1261 (holding that the district court's prohibition of cross-examination on a witness's mental health was permissible because the court allowed such examination outside the presence of the jury); *Hinkle*, 37 F.3d at 579 (holding that because the district court did not "rule out all testimony regarding the witness' mental health," it did not violate the Confrontation Clause when it excluded evidence that the witness was seeing a psychiatrist).

In sum, our precedent suggests the district court should have granted Robinson greater latitude in cross-examining the CI—or at least granted him the opportunity to argue that cross-examination was warranted—regarding the medications the CI was taking to treat his psychiatric problems.

## C. Harmless Error

Notwithstanding the district court's error, "the constitutionally improper denial of a defendant's opportunity to impeach a witness . . . , like other Confrontation Clause errors, is subject to . . . harmless-error analysis." *Van Arsdall*, 475 U.S. at 684. Because the error is of a constitutional dimension, "the

Government bears the burden to demonstrate that the error was harmless beyond a reasonable doubt." *Montelongo*, 420 F.3d at 1176. In conducting a harmless-error analysis we consider various factors, including "the importance of the witness' testimony in the prosecution's case, the cumulative nature of the testimony, the presence or absence of corroborating or contradictory testimony, the extent of cross-examination otherwise permitted, and the overall strength of the prosecution's case." *United States v. Toles*, 297 F.3d 959, 968 (10th Cir. 2002) (citing *Van Arsdall*, 475 U.S. at 684). Based on my review of the record, I disagree with the majority's conclusion that Robinson's verdict is "not worthy of confidence." In my view, the relevant factors require a conclusion of harmlessness.

Robinson's central argument on appeal is that the CI lied about the firearm transaction. But most of the CI's testimony was corroborated; the only uncorroborated portion of the testimony addressed the events that took place inside Robinson's house during the few moments of the controlled buy. As a consequence, Robinson falls back on a theory that strains credulity—he argues the lack of corroboration on this subject is critical, because it leaves open the possibility the CI "left the gun with [Robinson] the night before [the controlled buy] and merely picked it up when the ATF took him to the residence." Aplt. Reply Br. at 8. The jury heard the same theory during closing arguments and

rejected it, and I am persuaded additional cross-examination would not have made a difference in bolstering this theory.

*First*, though the CI's testimony was central to the government's case, it was largely corroborated by testimony from the ATF agent. Furthermore, the ATF agent testified he saw an unidentified black male (Robinson is African-American) invite the CI into Robinson's house, which suggests, in the very least, that the CI was with Robinson—and not alone—in the house at the time of the controlled buy. And despite its rough quality, the audio recording of the controlled buy at least minimally corroborated that the CI had a conversation with Robinson regarding the illegal pistol's missing serial number.

*Second*, Robinson failed to present any witnesses to contradict the important elements of the CI's story. Instead, Robinson called three witnesses to challenge the CI's recollection of the number of children present in the Robinson home at the time of the controlled buy, in an attempt to undermine the CI's credibility. But the CI never testified he saw the children at the time—he maintained that he merely heard the children playing in a back room during the transaction. Thus, nothing in the record suggests the CI's story was inaccurate.

*Third*, the defense's theory—that the CI was lying and had planted the gun to frame Robinson—would not have been bolstered by admission of evidence regarding the CI's psychiatric medications. The CI was not taking the medications at the time of the controlled buy. He may have been under the

- 15 -

influence of illegal drugs, but Robinson's counsel elicited this information during cross-examination and could have more fully explored the CI's drug abuse had he chosen to do so. That the CI's medications may have affected his memory *at the time of trial* does not shed any light on whether he lied about the transaction to federal agents or whether he intended to frame Robinson for the crime.

*Fourth*, Robinson was given ample opportunity to cross-examine the CI on various other grounds, including his motive for becoming a confidential informant, the payments and favors he received from the ATF, his criminal history, and his drug use. For example, the cross-examination revealed the CI had a criminal history, both as a juvenile and as an adult, and he became a confidential informant only after he was "arrested with a gun and some drugs by the Topeka Police Department." R. Vol. 2, Doc. 93 at 96. The CI also admitted the ATF paid him for his services and promised not to file criminal charges against him. Furthermore, after the CI became an informant, the ATF twice intervened when he had "scrapes" with the law, ensuring no charges were filed against him. R. Vol. 2, Doc. 93 at 99–101. Finally, the CI admitted he had smoked marijuana on various occasions—including the night before the controlled buy—in violation of his agreement with the ATF.

This cross-examination revealed to the jury the CI's potential bias in favor of the government and provided Robinson the opportunity to question the CI's credibility. The district court's limitations on cross-examination must be viewed

in light of the fact that Robinson was allowed an otherwise searching cross-examination of the CI in many respects. In short, Robinson effectively challenged the CI's motive, bias, and credibility even without the information contained in the mental health records.

*Finally*, the government's case against Robinson would have been strong even if Robinson had been allowed to cross-examine the CI on his psychiatric medications. The government's case consisted of testimony from the ATF agent, who carefully monitored the controlled buy and confirmed the information he received from the CI; an audio recording of the controlled buy, which recorded the CI discussing with Robinson the handgun's missing serial number; and testimony from the CI himself, who was under direct supervision of the ATF and had provided accurate information to the ATF on numerous prior occasions. Though the government's case might have been tangentially weakened had Robinson been able to inquire into the CI's psychiatric medications during cross-examination, none of the government's critical facts would have been contradicted.

Based on my review of the entire record, I am convinced that any error made by the district court in limiting cross-examination was harmless beyond a reasonable doubt. I would so hold, and would affirm Robinson's conviction.

## III. Conclusion

For the foregoing reasons, I respectfully dissent.